A04A1883. CADLE v. THE STATE.
(610 SE2d 574)

ADAMS, Judge.

Rodney P. Cadle was convicted by a jury of aggravated battery, seven counts of aggravated assault upon a peace officer, possession of a firearm during the commission of a crime and obstruction of a law enforcement officer. He appeals following the denial of his motion for new trial.

The evidence at trial shows that Cadle had an ongoing dispute with one of his neighbors. On the night of the events giving rise to the charges in this case, Cadle called 911 complaining the neighbors were causing a disturbance, and the neighbors called 911 complaining Cadle was causing a disturbance and threatening them; Cadle's wife, who was at work, also called 911 complaining the neighbors were causing a disturbance at their home. Law enforcement officers made several trips to the neighborhood in response to the calls, and during the last visit, based on the neighbors' statements that Cadle had made threats involving a weapon, they decided to arrest Cadle. However, when the officers went to Cadle's residence and attempted

---

[12] (Citation and punctuation omitted.) *Woodard v. Doty*, 236 Ga. App. 242 (511 SE2d 602) (1999).

to arrest him, Cadle broke away from the officers and ran inside his trailer, barricading himself inside a bedroom with four weapons. During the ensuing lengthy exchange between the officers and Cadle, which was recorded by the officers and introduced into evidence at trial, Cadle stated his exasperation over the situation with his neighbors, but denied that he had threatened them with a weapon. Cadle told the officers that he had turned to them for help but they tried to arrest him instead, and that he believed the only way for it to end would be for the officers to kill him. Cadle informed the officers he had weapons with him, but stated several times that he did not intend to use them.

At one point Cadle quit talking to the officers, so the decision was made to attempt to end the standoff by firing tear gas into the bedroom. As soon as the gas was fired into the room, Cadle immediately started firing one of his weapons through the wall, seriously wounding one officer, and the officers started firing back at Cadle. Although more gas was fired into the room after the wounded officer was removed, Cadle did not come out until after his father arrived and talked him into surrendering.

1. Cadle first contends that even without a request the trial court should have charged the jury on justification because it was his sole defense to the aggravated battery and aggravated assault charges. "[I]t is well settled in this State that the failure to give a charge on a defendant's sole defense in a criminal case, even without a request, constitutes reversible error if there is some evidence to support the charge. [Cits.]" *Parker v. State*, 230 Ga. App. 578, 579 (2) (497 SE2d 62) (1998).

Although Cadle did not testify at trial, he contends that his in-custody statement to police, which was admitted into evidence at trial, provided the necessary evidentiary basis to support the justification charge. We agree that this statement, which we have included in its entirety in an appendix to this opinion, offered at least some evidence to authorize a justification charge to the jury. And although the State argues that the evidence was overwhelming that the police officers did not open fire until Cadle fired on them first, this conflict in the evidence was for the jury, properly charged, to resolve. Moreover, at least one juror, even without being properly instructed, gleaned from the evidence that a justification defense had been raised. That juror, following an overnight recess from deliberations, sent the following note to the trial judge: "I have thought about this all day yesterday and last night. I believe that even if the prosecution has shown evidence to prove a crime I can still refuse to convict if I think the SWAT officers' actions resulted in that criminal act. Even if we find evidence to convict on each count, do we have to return a verdict of guilty on each count?"

In the absence of . . . a [justification] charge, the trial court's instructions to the jury as a whole contained omissions which constituted substantial error that was harmful as a matter of law. Consequently, [Cadle's] failure to take exception to the trial court's jury instruction, or [to] reserve the right to later object to the instructions, does not bar us from considering this matter on appeal. [Cits.]

*Parker*, 230 Ga. App. at 580 (2). *Stiles v. State*, 242 Ga. App. 484, 486 (1) (529 SE2d 913) (2000). Cadle is entitled to a new trial on the aggravated battery and assault charges.[1]

2. Cadle next contends that the trial court erred by instructing the jury that aggravated assault could be committed with intent or by criminal negligence. The indictment in this case charged Cadle with committing the various counts of aggravated assault upon a peace officer by making an assault with a deadly weapon, and the trial court properly instructed the jury on the elements of assault under OCGA § 16-5-20 (a) (1) and (a) (2):

Now to constitute an assault, the actual injury of the other person need not be shown. It is only necessary that the evidence show, beyond a reasonable doubt, an intention to commit an injury to another person, coupled with the apparent ability to commit that injury, or that the other person was intentionally placed in reasonable apprehension of immediately receiving a violent injury from the defendant.

During its deliberations, the jury twice sent a question to the court on whether the crime of aggravated assault required intent on the part of the defendant. In each instance, the trial court recharged the jury on the definitions of both criminal intent and criminal negligence, and in each instance defense counsel stated he had no objection to the charge. Pretermitting whether this failure to except or to reserve objections waived this issue for appellate review, we will address this contention so as to avoid error on retrial.

Cadle correctly argues on appeal that criminal negligence cannot substitute for criminal intent in proving the commission of an aggravated assault. "[A]n aggravated assault with a deadly weapon based on OCGA § 16-5-20 (a) (1) cannot be committed by criminal negligence." *Dunagan v. State*, 269 Ga. 590, 591-592 (2) (502 SE2d 726)

---

[1] Although a justification defense might arise in cases involving charges of aggravated battery and aggravated assault upon police officers, this court has previously held that justification is not a defense to an obstruction charge. *Green v. State*, 240 Ga. App. 774, 775 (1) (525 SE2d 154) (1999).

(1998). Although the charge is simply inapt as to an aggravated assault predicated on OCGA § 16-5-20 (a) (2), *Dunagan*, 269 Ga. at 593-594 (2), in this case it is impossible to tell from the verdict which form of aggravated assault served as the basis for the conviction.

> Thus, we cannot conclusively state that the verdict rested exclusively on the (a) (2) ground or that, if it rested on the (a) (1) ground, that the jury did not incorrectly substitute criminal negligence for criminal intent in rendering its verdict on the (a) (1) ground. Accordingly, because the erroneous jury charges could have misled the jury into believing that the evidence of [Cadle's] criminal negligence could substitute for the required criminal intent to commit the (a) (1) assault and the verdict returned by the jury leaves us uncertain that the verdict rested exclusively on the sufficient ground, we cannot eliminate the reasonable probability that the jury might have returned a different verdict had the trial court not given the erroneous charges.

(Citation omitted.) *Dunagan*, 269 Ga. at 594-595 (3). This error thus affords an additional basis for the grant of a new trial on the aggravated assault charges.

*Judgment reversed. Ruffin, C. J., and Bernes, J., concur.*

### APPENDIX.

Statement of: Rodney Cadle (RC)
Re: Officer shooting
Officer: James Garmon — GBI (JG)/Capt. Tommy Shiflett (TS)
JG: Alright. My name's James Garmon. I'm a GBI Agent. This is Captain Tommy Shiflett, who works with the Floyd County Police Department.
RC: Mmm, hmm.
JG: It's May the 8th, 2001. It's about 6:36 a.m. I'm gonna read you your *Miranda* rights, then we'll talk about this deal.
RC: Alright.
JG: Your name's Rodney Patrick Cadle, correct?
RC: Yes.
JG: C-A-D-L-E?
RC: Yes.
JG: How old are you, Rodney?
RC: Twenty-nine.
JG: And you live at 7 Harold Drive?
RC: Harold Drive.
JG: Rome, Georgia.

RC: Rome, Georgia.

JG: How far did you go in school?

RC: Eleventh grade.

JG: Alright. You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. You understand your rights?

RC: Yes, sir.

JG: You willing to talk to us?

RC: Yes, sir.

JG: Sign your name right there for me.

RC: Uh, . . . I'm hot.

JG: Ok, Rodney. You know what we wanna talk to you about.

RC: I believe I do.

JG: Ok.

RC: Hmm.

JG: We wanna talk to you about the shooting that took place at your residence earlier, earlier.

RC: Yes, sir.

JG: And I want you to tell me your side of it. Tell me what happened.

RC: Well, I took and called 911 to have your officers come out to break up a, the people that was disturbing the, me from behind my house. Uh, they were trying to goat me out to come out and fight.

JG: Ok. Who is they? Who, who are these people?

RC: Uh, 64 Rutledge Road, Mrs. Rutledge and her daughters and several other folks that I hadn't seen before.

JG: Ok. Go ahead. You, you, you and Mrs. Rutledge were, and her daughters were having problems?

RC: Yes, sir.

JG: Ok. And you called 911.

RC: And I called 911.

JG: Ok.

RC: To have ya'll come out to take and see if they couldn't make 'em disperse. And you're [sic] officer decided he wanted to take and arrest me. And I decided uh, I'm the one that called the police to come out so I wanted to basically know why he was gonna arrest me since I was the complainant.

JG: Ok.

RC: And didn't get no straight answers out, outta him so I took and run back to my bedroom.

JG: Ok. What'd you do when you got back there?

RC: When I got back there to my bedroom, I took and shut the lights

off, took, the door was shut, uh, and I took and had my weapons back there with me that was in my gun cabinet.

JG: What kinda weapons do you have, Rodney?

RC: I have a nine millimeter, a 380 pistol, a 44 magnum, an SKS, a pump twelve, and that's all that I have there.

JG: Ok. What'd you use to shoot the officer with?

RC: SKS.

JG: Ok. Why'd you shoot him?

RC: They, ya'll took and opened fire on me.

JG: You say they shot first?

RC: Yes, sir.

JG: Ok.

RC: They fired on me and then I retaliated.

TS: When was the shot, the first shot fired?

RC: . . . I don't know what time it was.

TS: When you got in the bedroom or before you got in the bedroom? What'd,

RC: It was after I got into the bedroom.

TS: Go ahead. I'm sorry.

RC: Uh, number one thing the Captain that was out there, he kept wanting to, me to come out so they could arrest me and I, I kept asking him why. I was the one that called them. That's what I wanted to know. My number one question was why am I gonna be under arrest for calling ya'll?

TS: Go ahead.

RC: I never got an answer from ya'll. Never did. They, a, officers never answered me.

JG: How many times did you call 'em today?

RC: I took and called 'em once, . . . last night, I called 'em one time.

JG: Had Mrs. Rutledge called 'em earlier today?

RC: Yes, sir.

JG: Ok. How many times had, had the police been out there in reference to this argument between you and Mrs. Rutledge?

RC: They come out one time when she called 'em.

JG: Mmm, hmm.

RC: They come back a second time when I was talking to my wife on the telephone. She took, went and talked to, I don't know what the Sergeant's name up at the jail was, and took and asked him to come back out there cause they was, the b, group [of] people that was back there trying to goat me out to fight and I wadn't gonna have it.

JG: Ok. What was they doin', how was they tryin' to, tryin' to, you say goat you out?

RC: Yes, sir.

JG: How was they,

RC: They was out there cussin' and raisin' cain.

JG: Ok. What started this argument?

RC: Well, it goes back to when I moved my trailer up there first. Old Lady Rutledge didn't like that I put my trailer there. And I had two an, two dogs and when I first moved in up there, I took and tied one of 'em out and the other one had just always gone and done as it wanted to cause it was just a little small dog.

JG: Mmm, hmm.

RC: Uh, they decided that . . . my other dog needed to be chained down so I took and said alright, if my dogs need to be chained down then her daughter's dogs need to be chained down too. So I took and called the dog pound to them and had them come out to take and tell them that they needed to lock their animal up because their animal was coming over there eating my animal's food. And they don't like that, that they have to abide by the same rules and everything else everybody else has to. (inaudible),

JG: How long, how long has this argument been going on?

RC: Since uh, 'bout the end of December. I mean, anytime I take and turn a radio on for my kids or anything like that, bam they get called. And I'm talking 'bout, I can take and walk on the outside of my house and just barely hear the radio and ya'lls officers have come up and said they didn't hear the radio.

JG: Ok.

RC: But she can.

TS: How many times did you fire your weapon? (cough)

RC: I have no idea.

TS: Once, more than once, twice?

RC: The only thing I know is I took and kept pulling the trigger.

TS: Was you aimin' at a particular officer or,

RC: No, sir.

TS: Did you see 'em or what?

RC: I couldn't see nothing. I, all I was in was a black room with a wall. And all, all of a sudden all I seen was (inaudible) come flyin' through the door and through the wall at me and I was retaliating because I don't know why I was going . . . why this was happenin' cause no one would answer me.

JG: What, you said you saw stuff flying through the wall.

RC: Yes, sir.

JG: What, what'd you see?

RC: I seen,

JG: Or did you see the bullets?

RC: Where the bullets was coming through the door and the walls at me. And next thing I know there's uh, two canisters of tear gas throwed in the room or whatever ya'll call it.

JG: Is that, and then uh, is this after you were shootin'?

RC: Yes, sir. This is uh, the tear gas come in after I started to fire. The

bullets come through my door and then the tear gas come from the right hand side through my window. And then the second or third one that come through, come through my left hand bedroom window and broke the glass outta my . . . gun cabinet.

TS: Had you had a pistol or been outside earlier with a gun around Mrs. Rutledge?

RC: No, sir. . . . I don't have to threaten that woman. She's already took and picked up bricks and was gonna throw a brick at me. She's took and picked up rocks toward my wife.

TS: Tell me how you first saw the officer tonight, when he came to your house. Tell me exactly what happened right there.

RC: What . . . first time,

TS: (cough)

RC: The officer come to the house, he took and said that Mrs. Rutledge and the woman down the road had took and called 'em out because I took, went down to talk to one of the children's mothers that lives down the road. The child said that another child took and told hi, the child my child normally plays with, I don't know his name, but Joey's the kid that took and told him. It's another little kid that starts trouble. And the kid come up to my door, asked me if I had said something about hurtin' the child. I told him no. I also took and told the k[id], that he needed to . . . have his mother call me so I could find out what was being said. And she didn't call me so I took and seen the child outside and her, his mother outside so I walked down there to talk to 'em to find out what was being said in front of Mrs. Rutledge. Cause I wanted to know what she'd been sayin' about me. Cause this kid took and to, flat out told me that the, what was said was that I was gonna hurt the kids. And I ain't gonna hurt nobody's kids.

JG: Talkin' 'bout hurtin',

RC: I,

JG: Your kids or somebody else's kids?

RC: Somebody else's kids.

JG: Ok.

TS: To get back on it, you went down and talked with her and then you went back home. Now,

RC: Yes, sir.

TS: And then

RC: I,

TS: You called the police.

RC: Took,

TS: Tell me about what happened then.

RC: When I called the police?

TS: Mmm, hmm.

RC: When I took and called 911,

TS: (sniff)

RC: The officer come up. He . . . I don't know if he went across the road behind me and talked to them or not, but all [the], only thing I seen was him take and pull up, go and knock on, knocked on my door, I opened the door, I started to talk to him, he went to reach and grab for my hand and I said, no, sir. I'm the one that called ya'll. That's word for word what I said.

TS: Go ahead.

RC: And he took and says, hang on, you, you, you just under arrest. You're under arrest. And I . . . said, oh, no, I ain't and I went back to the other end of the trailer and got in my bedroom. And I couldn't never get 'em to answer me why I was gonna be placed under arrest. That's the only thing I wanted to know. Can you tell me this?

TS: Can I?

RC: Yeah.

TS: I don't know. I'm trying to get to the bottom of it myself.

RC: I wanna know why I was un, gonna be under arrest. That's my only question.

TS: Did you at anytime today have guns out in that neighborhood?

RC: No, sir.

JG: Alright. Let me ask you this. I meant to to start with. Are you under the influence of any drugs or alcohol,

RC: No, sir.

JG: Since we've talked?

RC: No, sir.

JG: I mean, and you're aware of what's going on?

RC: Very much aware.

JG: Ok. And you, do you have any mental problems or anything like that that you're aware of?

RC: Mmm, well, I, I was diagnosed one time, but,

JG: Diagnosed with what?

RC: Paranoid schizophrenia. Uh, homicidal tendencies, uh, and doctor said three or four other things, but I,

JG: What, what doctor was that?

RC: One over here at Floyd. Uh . . . I don't remember his name, but he took and put me in Winwood for a little while.

TS: Are you on medication of any kind now?

RC: No, sir.

TS: You're not taking any medication for the schizophrenia or whatever?

RC: No, sir.

JG: How long ago was it, how many years ago or months ago or whatever it was?

RC: That's been about three years, three, three and a half years ago.

JG: And you [were] in Winwood a little while?

RC: Yes, sir.

JG: What do you call a little while?

RC: Uh, 'bout two months.

JG: Ok. Alright. But I mean, you know what's going on. You're not having a problem understanding us. You know what happened tonight. You know what you did and all that good stuff.

RC: I believe so, yes, sir.

JG: Ok. And you can't remember how many, you just, did you pull the trigger 'til the, 'til your rifle was empty?

RC: No, sir.

JG: Ok.

RC: That particular clip that I had in that rifle holds sixty shells and there's no way that sixty shells went outta the end of it because the barrel would be too hot for it to be even . . . be touched.

JG: Mmm, hmm.

TS: But you did fire more than once that you're aware of?

RC: I'd say probably about five.

TS: Through he door?

RC: Through the wall and the door, yes.

TS: Through the wall and the door?

RC: . . . I kinda went up high.

TS: (Inaudible)

RC: Cause I didn't, I didn't wanna hit 'em. But they was firing at me and I had to figure out some way to make 'em stop.

JG: Was you sittin' on your bed? Was you layin' in the floor, or,

RC: I was layin' in my bed.

JG: Layin' in the bed?

RC: I was, like, this right here's my bed, this is my headboard. I was layin' here in the bed with two pillows behind my head.

JG: Just kinda sittin' up in the bed?

RC: Yes, sir.

JG: With you rifle across your,

RC: No.

JG: Lap or your chest?

RC: I had it laid beside me. I had it laid right beside me, yes, sir.

JG: Ok, And then, you say they fired first?

RC: They fired at me first.

JG: (Inaudible) just pick it up and set in your bed and shoot out there or,

RC: The only thing I done was took and pulled the rifle up like this right here and took and cocked it to the side and said, tat, tat, tat, tat, like that right there and took it across up high, 'bout midway of the wall. I took it midway of the wall and it's still going upward as it was leavin' outside the room.

JG: Ok.

RC: Only thing I wanted 'em to do was duck. And quit shootin' at me cause when I, they took and went to shootin' at me, I took and said,

tat, tat, tat, tat, tat, and then I rolled into the floor and gas started comin' everywhere.

JG: Ok.

TS: Are you aware that you did hit some officers with your fire?

RC: No, I [wasn't], very much aware of that, but when I come out I seen, I took and seen some streaks in the floor and I took and asked 'em what was uh, wh, what it was and the officer says, I don't know.

JG: Well, do you regret that you hit somebody when you were shootin?

RC: I didn't wanna hurt, hit nobody. That's the reason I tried to aim up. So wh, uh, down angle, that was only weapon, it . . . just shoulda went right across the top of it, everybody unless they was right up against that wall.

JG: Ok. If they had been, it mighta hit 'em in the face or the chest or something, right?

RC: Yes, sir. It woulda took and hit 'em toward the top of their head,

TS: How,

RC: Because I took.

TS: (cough)

RC: And tried to give it enough arch to, where a standard size five foot man wouldn't get hit. At least I tried that.

TS: You're [sic] ceilings in your trailer are how tall?

RC: They're vaulted.

TS: (Inaudible), eight foot (Inaudible)?

RC: They up like that.

TS: Ok.

RC: (cough)

TS: But in that room, it is eight foot walls?

RC: Uh, that wall over at the closet part of it,

TS: Where you shot into (Inaudible),

RC: It's a eight foot wall and then as you come into the room it goes up to I think about twelve or fourteen foot high. Because I've got a twenty-seven inch color television hung up on the wall and I could stand under the TV and I'm right at five nine.

TS: (cough)

JG: Well, one of the rounds you fired hit the officer just below the knee which, which obviously had to be low. Could that've been the first one you got off before you,

RC: It might have been, yes.

JG: Started the arch on that last one, when you finished your arch?

RC: Well, when I was finishing my arch, I was trying to get outta the bed to get down on the floor.

JG: Ok.

TS: Did you stay in that room?

RC: The whole time, yes, sir. I stayed in that room.

TS: There's not a bathroom or anything off that bedroom you's in?

RC: There's a bed, (inaudible), there's a bathroom and there's a double walk, there's a big walk-in closet on each side of it.

TS: You didn't never leave that room to go into the bathrooms or,

RC: I went into the bathroom one time and used the bathroom,

TS: No, I'm talkin' 'bout,

RC: Before they were,

TS: When the shooting started.

RC: No. I took and walked into the bathroom took and wet me a bath towel cause I knowed ya'll was probably gonna just go ahead and try to come in and take and I knowed tear gas was one of the things ya'll gonna use. So I wet me a bath towel and wrapped it around my face to keep it from . . . burning my throat and my nose.

JG: Is this before the shooting started?

RC: No, sir.

JG: Ok.

RC: I took and wet the towel before the . . . shooting started.

JG: Well, that's what I was asking.

RC: Yeah. Yeah.

JG: When you ran back into the bedroom, was that the first you did is wet the towel and put over your face and then lay down on the bed?

RC: No.

JG: Ok.

RC: I had been there for a little bit and you're [sic] captain or yeah, the captain or yeah, the captain that was out there . . . was talking to me, I took and went into the bathroom, used the bathroom, had to urinate, took and got me a towel, took and wet it, wadded it up and laid it right there beside the bed with me.

JG: Ok. And you did that because you figured they's gonna put tear gas in there?

RC: I figured that ya'll was gonna do it, yeah.

JG: Ok.

TS: Did they ask you to come outta the bedroom?

RC: Yes, sir. They asked me to come outta the bedroom and I took and asked them why am I gonna be arrested and they wouldn't answer me. Because I'm the one that called 'em. If they woulda answered that question, I, yes, sir. I'd a come out.

TS: What finally ended this?

RC: What finally ended this?

TS: Uh, huh. When you came out, how did you come out?

RC: I come out cause my father asked me to.

JG: Ok. I don't, Tommy, I can't, I think we've covered all the bases. I can't think of anything else to ask him. . . .

Decided February 11, 2005.

*Cook & Connelly, Rex B. Abernathy*, for appellant.

*Leigh E. Patterson, District Attorney, Harold W. Goldin, Jr., Assistant District Attorney*, for appellee.