317 Ga. 189
FINAL COPY

S23A0550.  REESE v. THE STATE.

WARREN, Justice.

After a jury trial in May 2018, Larry Reese was convicted of the malice murder of Claynesia Ringer, possession of a firearm during the commission of a felony based on shooting Ringer, and possession of marijuana with intent to distribute.[1]  Reese raises three claims of error on appeal: (1) that the trial court plainly erred by failing to instruct the jury on justification, no duty to retreat, and the State's

---

[1]  The crimes occurred on August 19, 2015.  On May 3, 2016, a Fulton County grand jury indicted Reese on nine counts: malice murder, three counts of felony murder, aggravated assault with a deadly weapon, first-degree criminal damage to property, criminal attempt to sell marijuana, possession of marijuana with intent to distribute, and possession of a firearm during the commission of a felony.  After a jury trial from May 7 to 11, 2018, Reese was found guilty on all counts except criminal attempt to sell marijuana and the felony murder count predicated on it.  Reese was sentenced to life in prison for malice murder, five years consecutive for possession of marijuana with intent to distribute, and a suspended five-year consecutive sentence for possession of a firearm during the commission of a felony.  The remaining counts were vacated by operation of law or merged.  Reese filed a timely motion for new trial on May 14, 2018, which he amended three times.  The trial court denied Reese's motion for new trial, as amended, on February 15, 2022.  Reese filed a timely notice of appeal.  This case was docketed in this Court to the April 2023 term and submitted for a decision on the briefs.

burden to disprove affirmative defenses; (2) that the trial court plainly erred by not giving an accomplice corroboration charge; and (3) that Reese received constitutionally ineffective assistance of counsel.

1. (a) Shortly before 3:00 a.m. on August 19, 2015, Ringer was shot and killed inside a red Nissan Versa parked on the street in front of Reese's house. Ringer and Reese knew each other and lived down the street from each other. Evidence showed that Ringer borrowed the Versa from a friend and drove it to Reese's house after her phone sent text messages to Reese's phone asking to purchase marijuana.

The State's theory of the case was that Reese was a paranoid drug dealer who shot Ringer after she approached his house in the early morning hours in the Versa—a car he did not recognize. Reese's theory of the case, by contrast, was that Reese shot at the car in self-defense. That is so, Reese argued, because Ringer, along with an unidentified person (and potentially one of the men she had spent time and exchanged text messages with earlier that evening),

2

went to Reese's house that night to rob Reese under the guise of purchasing marijuana from Reese. In the course of that attempted robbery, either Ringer or her companion first shot at Reese before Reese returned fire in self-defense, shooting and killing Ringer.

(b) The evidence presented at trial showed the following. At 2:49 a.m., Reese's mother (with whom he lived), called 911 to report a shooting in front of her house. Police arrived at the scene within minutes and found Ringer dead in the driver's seat of a Nissan Versa in front of Reese's house. The car was still running, the driver door was open, and the other doors were closed and locked. The car was parked directly in front of Reese's house facing an SUV registered in Reese's name. There were multiple bullet holes and defects around the car's driver door, including on the door, the doorframe, and the driver window. Helen Weathers, a forensics supervisor with the Fulton County Police Department, testified that the hole in the window was consistent with a bullet traveling through the window from the outside of the vehicle to the inside. The medical examiner's

3

office recovered a .45-caliber metal jacket bullet from Ringer's body during her autopsy.

Among other things, fifteen one-dollar bills[2] and Ringer's cell phone were found inside the car. No gun was found inside the car or at the scene of the shooting. A pack of cigarettes with Reese's fingerprints on it and a few cigarette butts were found near Reese's SUV. In Reese's driveway, officers found a single key. And in Reese's front yard, officers found a key ring attached to a bright yellow tag, which contained a key to Reese's SUV and to his house.

Five .45-caliber shell casings were found in Reese's yard. Officers found two shell casings close to the key ring; the other three were found days later when officers returned to Reese's yard with a metal detector. In addition, officers found two .45-caliber metal jacket bullets, a metal jacket, and bullet fragments in and around the Versa. No bullet defects were discovered in cars parked in Reese's driveway or in the front door of his house. Officers also

---

[2] As noted below, minutes before the shooting, Ringer's phone sent a text message to Reese's phone asking to purchase fifteen dollars' worth of marijuana.

noticed surveillance cameras on the outside of Reese's house pointed toward his yard: one on the left side of his house and another on the right side.

Based on the presence of surveillance cameras that might have recorded the shooting and on Reese's keys that officers found in his yard near the .45-caliber shell casings, officers obtained two warrants to search Reese's house, one for recorded surveillance videos and another for firearms. The search yielded, among other things, a DVR system with recordings from the surveillance cameras affixed to the outside of Reese's house, 14.7 ounces of marijuana, a small scale, and cash. Reese's fingerprint was found on a bag of marijuana in the house.

A later search of the contents of Ringer's cell phone revealed communications with three phone numbers around the time of the crimes. One phone number belonged to Reese; another belonged to Gerald Bell, who lived across the street from Reese and down the street from Ringer; and another ended in -8146, which Dwoskin

Wright, a friend of Ringer's, identified as his own during an interview with investigators.[3]

Ringer's phone also showed various text messages and phone calls with Reese's phone from around 12:30 a.m. until around 1:30 a.m. on the night of the shooting; the text messages were about Ringer having sex with one of Reese's friends and Ringer arranging for someone to have sex with Reese, each in exchange for money. The text messages showed that neither arrangement worked out, and a message was sent from Reese's phone saying the situation sounded like a "set up" anyway.

Ringer's phone received a text message from the -8146 phone number at 1:24 a.m. saying, "I'm finna pull up." Ringer's phone sent a text message to the -8146 phone number with her address at 2:02 a.m.; at 2:09 a.m. the user of the -8146 phone number communicated that the user was on the way; shortly afterward, Ringer's phone and

---

[3] At trial, Wright testified that he had changed his number several times since the crimes and did not recall having this phone number.

the -8146 phone number exchanged text messages discussing marijuana.

Ringer's phone sent a text message to Bell's phone at 2:30 a.m., saying that a friend wanted to purchase a gram of marijuana for ten dollars. Also at 2:30 a.m., Ringer's cell phone made a three-second phone call to Reese's cell phone.

At 2:31 a.m., Bell's cell phone responded to the message from Ringer's phone asking to buy marijuana, asking, "U gone Kum get it," and Ringer's phone responded saying, "Ya" at 2:40 a.m. Then, at 2:43 a.m., Ringer's phone sent a text message to Reese's phone, asking to buy two grams of marijuana for fifteen dollars, and her phone called Reese's phone again at 2:44 a.m., this call lasting for 20 seconds.

Ringer's phone then received two missed calls from Bell's phone number at 2:48 a.m., a text message from his phone number asking to bring him a "blunt" at 2:49 a.m., and another text message from his phone number at 3:09 a.m. saying, "Yoo kall me real quick." Ringer's phone also received multiple missed phone calls and

7

FaceTime calls from the -8146 phone number between 2:46 a.m. and 2:59 a.m.

In November 2015, officers finished reviewing the surveillance videos from outside Reese's house. The videos included footage of the shooting, which the two cameras affixed to Reese's house captured from different angles. The video recorded from the camera on the left side of Reese's house captured what Reese now concedes is him firing a gun and running across his yard. The video recorded from the cameras on the right side of Reese's house captured the Versa parking in front of Reese's house, a flash near the road, and then a larger flash in Reese's yard. Reese concedes on appeal that the larger flash was a muzzle flash that resulted when he fired a gun.[4]

(c) Video recordings from the surveillance system were played at trial. The State played the two surveillance videos portraying the

---

[4] As described in more detail below, Reese contends that the smaller flash was also a muzzle flash, but that it was from a shot fired by someone other than him.

shooting side-by-side as one exhibit, but the trial court expressly reserved for the jury the question whether the videos were synchronized.[5]

A GBI firearm examiner, Investigator Jason Roach, testified at trial about the surveillance videos, explaining that the first flash of light shown on the camera from the right side of Reese's house, near the road, was not "consistent with a muzzle flash" and was "more consistent" with "a bullet impact." He also testified that there was a muzzle flash seen near the person standing in Reese's yard, which occurred after the sparks from the "bullet impact." On cross-examination, Reese's trial counsel asked if Investigator Roach could determine where the gunshot that caused the bullet-impact flash came from. Investigator Roach testified that if the two surveillance videos were synchronized, then there was a possibility that the bullet-impact flash resulted from a gunshot fired by Reese that was

_____

[5] As explained more below, Reese contended at trial that the surveillance videos were not synchronized—in other words, that they were not two videos taken at the same time showing the same events from two different angles— and relies on that to support his claim for slight evidence of justification. The videos were not time-stamped.

depicted in the left-side surveillance video. But Investigator Roach could not rule out that the bullet-impact flash came from a shot fired "somewhere else that wasn't captured on the video."

Investigator Roach also explained that he determined the five .45-caliber shell casings were fired from one gun, and that the three .45-caliber bullets and the metal jacket were fired from one gun, but he could not match a bullet fragment recovered from the Versa with the bullets and the metal jacket recovered from in and around the Versa or in Ringer's body because the fragment had been "severely damaged." Nor could he determine whether the .45-caliber shell casings were fired from the same gun as the .45-caliber bullets, metal jacket, and bullet fragments.

Bell—who lived across the street from Reese and around the corner from Ringer—testified that he was with Ringer earlier on the night of the crimes. Specifically, Ringer was at Bell's house until around 10:00 p.m. before going home. Closer to 11:00 p.m., Bell went to Ringer's house to eat dinner. He returned to his house after dinner and did not see Ringer again. Bell's mother, with whom he

lived, testified at trial that she heard gunshots that night and that once police arrived at the crime scene, she "ran downstairs" to wake up Bell, who was "in his room [a]sleep." She did not testify about what time she heard gunshots or woke up Bell.

Bell also testified about his relationship with Reese. Reese lived across the street from Bell and they had "spoke[n] a few times." Bell and Reese did not have "bad blood or anything." When the State asked Bell, "Did you by occasion happen to go over to [Reese's] house or see [Reese] that day," Bell responded, "Yeah, earlier."

Ringer's friend, Wright, testified that, on the night of the crimes, he borrowed his cousin's red Nissan Versa to drive to Ringer's house. Once Wright arrived around 2:20 a.m., he asked Ringer to go buy some marijuana. He was going to ride with Ringer to pick up the marijuana, but Ringer said she wanted to go alone, and Wright let her drive the Versa. Wright heard gunshots within "two to three minutes" after Ringer left. Sometime after hearing the gunshots, Wright went to speak with Ringer's mother, whom he met that night and with whom Ringer lived, and he tried calling Ringer.

11

Karimah Tarver, Ringer's mother, lived with Ringer. She testified as follows. On the night of the crimes, Tarver was in her bedroom when she heard gunshots. She left her room and spoke to Wright, who was still in the house. Bell had been at the house earlier that night to have dinner with Ringer, but had left before the shooting (although she did not see him leave). On cross-examination, in response to a question from Reese's trial counsel, Tarver agreed that, shortly after the shooting, she told Detective Jeff Rittberg, the lead investigator, that she "suspected" Bell was "involved" in the shooting. Tarver explained that her suspicion was just "what [she] was feeling" and that she "wouldn't say that" she suspected Bell was involved.

Detective Rittberg testified that he spoke with Bell's mother shortly after the crimes, and Bell was present during the conversation. Bell did not tell Detective Rittberg that he knew Ringer, that he was at Ringer's house on the night before the crimes, or that he had been communicating with her leading up to her death. Detective Rittberg acknowledged that Tarver told him that she

12

suspected Bell "was in the vehicle with her daughter" at the time of the shooting because Bell "was being overly nice" to Tarver. But Detective Rittberg ruled out Bell as being involved in Ringer's death because, based on the evidence he gathered, Bell was at home during the shooting. Likewise, Detective Rittberg ruled out Wright as a suspect because Wright was with Tarver at her house during the shooting.

Reese did not present any witnesses or testify at trial. During closing arguments, Reese's trial counsel argued that Reese was justified in shooting Ringer because the first flash seen on the surveillance video, which was near the road, showed the ricochet of a shot fired at Reese by a shooter outside the camera's view; that Reese only fired after first being shot at which might show some "excuse or mitigation" for the shooting; that Ringer, along with someone else, was trying to rob Reese; and that the absence of shell casings from more than one gun did not rule out a second shooter

because the second shooter could have fired with a revolver, which would not necessarily have left shell casings at the scene.[6]

Reese's trial counsel also argued that Bell might have been involved in Ringer's attempted robbery of Reese. To that end, counsel contended that, after the car Ringer was driving passed Reese's house, Ringer stopped at Bell's house before turning the car around, that Bell saw Ringer during this stop, and that Bell texting and calling Ringer before and after the shooting showed Bell was lying when he testified that he was asleep during the shooting.

The jury convicted Reese of malice murder, possession of marijuana with intent to distribute, and possession of a firearm during the commission of a felony. Reese was sentenced to life in prison and five years, to be served consecutively.

---

[6] On cross-examination, Investigator Roach testified that semi-automatic handguns automatically eject shell casings after being fired, but the only way to eject shell casings from a revolver is for the user to do so manually.

2. Reese contends that the trial court erred by not instructing the jury on justification and no duty to retreat.[7] Although Reese requested these instructions, he did not object to their omission. As Reese concedes, we review these claims for plain error only. See *Johnson v. State*, 316 Ga. 672, 687-688 (889 SE2d 914) (2023) (reviewing for plain error the trial court's failure to instruct the jury on charges requested in writing when the appellant did not object to the instruction's omission). And these claims fail under the third prong of plain-error review because Reese has not shown that there is a reasonable probability he would have obtained a better result had the trial court given the jury instructions he requested.

The plain-error standard has four prongs.

First, there must be an error or defect—some sort of "[d]eviation from a legal rule"—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected

---

[7] Reese also argues that the trial court plainly erred by not instructing the jury on the State's burden to disprove affirmative defenses. But the record shows that the trial court instructed the jury that the State bore the burden of disproving affirmative defenses beyond a reasonable doubt, so this claim presents nothing for our review.

the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the trial court proceedings." Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

*Taylor v. State*, 315 Ga. 630, 637 (884 SE2d 346) (2023) (quoting *Gates v. State*, 298 Ga. 324, 327 (781 SE2d 772) (2016)). Reese must satisfy all four prongs to succeed on this claim. But even assuming that the trial court not instructing the jury on justification and no duty to retreat was clear and obvious error and that this assumed error was not affirmatively waived, this claim still fails because Reese has not shown that the assumed error likely "affected the outcome" of his trial.

"A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force[.]" OCGA § 16-3-21 (a). Relevant here, deadly force is

16

authorized when the person "reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony." Id. Someone justified in using such force as authorized by OCGA § 16-3-21 (a) "has no duty to retreat and has the right to stand his or her ground and use force" as authorized by law. OCGA § 16-3-23.1. And when a defendant sufficiently raises a justification defense at trial, "the State bears the burden of disproving the asserted defense beyond a reasonable doubt." *Gobert v. State*, 311 Ga. 305, 309 (857 SE2d 647) (2021) (citation and punctuation omitted).

Reese's sole defense at trial was self-defense; his theory was that someone shot at him first and that he fired the shots that killed Ringer only in response to someone shooting at him. But the evidence supporting Reese's self-defense theory was not sufficiently strong that the omission of the instructions likely "affected the outcome" of his trial. *Munn v. State*, 313 Ga. 716, 722 (873 SE2d 166) (2022).

17

No witness testified that there was more than one shooter at the crime scene. Investigator Roach did not identify muzzle flashes from the surveillance video anywhere other than in Reese's yard. Investigator Roach also testified that all shell casings recovered from the scene were fired from a single .45-caliber weapon, and that all of the bullets recovered from the scene were fired from one .45-caliber weapon. Detective Rittberg testified that there were no bullet defects in cars parked in the driveway of Reese's house or in the front door to the house, both of which would have been near where Reese was standing when someone allegedly was shooting at him, and that no gun was found in the Versa.

Reese nonetheless points to a number of facts that he says supports his self-defense theory. First, Reese claims that "forensic evidence" supported the inference that Reese was "on his own property when the shots were fired." But even assuming that is true, that fact does little, if anything, to show whether someone shot at Reese before he fired his weapon. Second, Reese points to the surveillance video that showed a flash near the road while Reese

was standing in his driveway, which he contends showed a bullet-impact spark from a shot fired by someone else. However, the mere possibility that the bullet-impact spark was caused by a gunshot fired by someone else is not enough given the lack of physical evidence suggesting there was more than one shooter. And third, although there was testimony that Tarver once suspected Bell was involved in Ringer's death and that he was in the car with her, she conceded at trial that she had no knowledge to support that theory and that it was just a "feeling" she had. Moreover, no witness testified that Bell was seen at the crime scene, Bell's mother testified that she found Bell in bed after she heard the gunshots, and Detective Rittberg testified that, as part of his investigation, he ruled out Bell's involvement in Ringer's death. And even if the evidence had supported Bell's presence at the scene, that would not itself prove Reese's theory that someone else first shot at Reese.[8]

---

[8] Reese also contends that some of Investigator Roach's testimony about flashes seen on the surveillance video supported his theory that the video showed someone firing at Reese before Reese fired his gun. But Reese does not accurately recount Investigator Roach's testimony: although Reese states that

Because the evidence supporting Reese's self-defense theory was weak, we cannot say that the trial court omitting jury instructions on justification likely affected the trial's outcome. See *Munn*, 313 Ga. at 722 (defendant's substantial rights were not affected by not instructing the jury on justification when evidence in support of the defense was weak); *Jones v. State*, 310 Ga. 886, 889 (855 SE2d 573) (2021) (harmless error to fail to charge on defense of self or third person because "evidence supporting a charge on defense of self or a third person" "was meager at best").[9] And because the "no duty to retreat" rule applies when "a person is

Investigator Roach identified the initial flash as a muzzle flash, his actual testimony was that the flash was consistent with a bullet striking an object.

[9] To support his assertion that omission of these instructions likely affected the outcome of his trial, Reese points to a number of Georgia appellate cases he says support his analysis. However, three of those cases did not even assess the likelihood of any error affecting the result. See *Tarvestad v. State*, 261 Ga. 605 (409 SE2d 513) (1991), *Cadle v. State*, 271 Ga. App. 595 (610 SE2d 574) (2005), and *Bishop v. State*, 271 Ga. 291 (519 SE2d 206) (1999). And in the fourth, *State v. Alvarez*, 299 Ga. 213 (790 SE2d 66) (2016), it was undisputed that the defendant's brother had been in a "fist fight" with the victim immediately before the defendant shot the victim, id. at 214, and "justification was the critical disputed issue at trial," id. at 215. Here, by contrast, little evidence supported the assertion that anyone besides Ringer and Reese were present at the crime scene, and that in turn supported Reese's asserted theory of justification.

otherwise justified in using force," *Arnold v. State*, 302 Ga. 129, 132 n.6 (805 SE2d 94) (2017), Reese likewise has not shown that omitting that instruction likely affected the outcome of his trial.

3. Reese contends that the trial court plainly erred by failing to instruct that testimony from an accomplice is insufficient to establish a fact unless it is corroborated. This claim is reviewed for plain error because Reese did not request the instruction at trial, see *Rutland v. State*, 315 Ga. 521, 523 (883 SE2d 730) (2023), and it fails at the second step because Reese has not shown that the trial court committed a "clear or obvious" error. *Taylor*, 315 Ga. at 637.

"A jury instruction on the need for accomplice corroboration should be given if there is slight evidence to support the charge." *Stripling v. State*, 304 Ga. 131, 136 (816 SE2d 663) (2018) (citation and punctuation omitted). An accomplice is someone who "shared a common criminal intent to commit the crimes in question with the actual perpetrators." *Ash v. State*, 312 Ga. 771, 795 (865 SE2d 150) (2021) (citation and punctuation omitted). "[A]ctions and knowledge after the commission of the crimes" are not enough to make a

21

witness an accomplice, but "[a]t best" show the witness is an "accessory after the fact." Id. at 795-796 (citation and punctuation omitted).

In Reese's view, the jury could have inferred Bell was his accomplice to the charge of possession of marijuana with intent to distribute and to the felony murder of Ringer predicated on that charge. To support that inference, Reese points to the following evidence: Ringer's last accepted phone call was from Bell's phone number; Ringer's phone sent text messages to Bell's phone about her purchasing marijuana from Bell; Tarver told detectives that she suspected Bell was involved in Ringer's death and in the car when she died; Bell was evasive when police interviewed him; surveillance video showing a flash in the street before Reese's muzzle flash; and Bell had a motive and opportunity to commit the crimes.

But none of the evidence Reese points to amounts to "slight evidence" that Reese and Bell together possessed marijuana with the intent to distribute it. At best, he points to text-message evidence that Ringer was attempting separately to purchase

22

marijuana from Reese and Bell the night of the crimes. Nor did the State or Reese argue at trial that Reese and Bell possessed marijuana with the intent to distribute it together. Accordingly, Reese has failed to show the trial court erred, much less clearly and obviously erred, by not instructing the jury on accomplice corroboration. See *Thornton v. State*, 307 Ga. 121, 125-126 (834 SE2d 814) (2019) (trial court did not err, let alone plainly err, by not giving an accomplice corroboration instruction because "[n]one of the eyewitnesses to the shooting testified that" the defendant and the alleged accomplice "acted together to" commit the crime, "none of the evidence supported an inference" they committed the crime together, and the defendant did not argue they committed the crime together but instead argued the alleged accomplice committed the crime and that he was innocent).

4. Reese contends that his trial counsel provided ineffective assistance under the Sixth Amendment to the United States Constitution in three respects: for failing to (1) move to suppress unlawfully obtained evidence; (2) request an accomplice-

corroboration instruction; and (3) object to an allegedly improper sequential jury instruction.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington,* 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013). See also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See id. at 693-694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the

reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

Claims of ineffective assistance of counsel involve mixed questions of law and fact, and "a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous." *Green v. State*, 302 Ga. 816, 818 (809 SE2d 738) (2018) (citation and punctuation omitted). Conclusions of law based on those facts are reviewed de novo. See *Bright v. State*, 292 Ga. 273, 274 (736 SE2d 380) (2013).

(a) Reese contends his trial counsel was ineffective for failing to file a motion to suppress what he says was unlawfully obtained evidence. Reese specifically argues that the key ring with the yellow tag and the shell casings recovered from Reese's yard, as well as the evidence that Reese's house was equipped with surveillance cameras, should have been suppressed because they were discovered during a search of his curtilage that violated the Fourth Amendment

25

to the United States Constitution.[10]  Because Reese has failed to make a "strong showing" that the trial court would have suppressed the evidence on the basis that it was obtained during an illegal search of his curtilage, *Tabor v. State*, 315 Ga. 240, 249 (882 SE2d 329) (2022), he has not shown that his trial counsel was constitutionally deficient for failing to file a motion to suppress on that basis.

As background, Detective Jeff Rittberg, the lead investigator, testified at the motion-for-new-trial hearing, as follows.  He arrived at the crime scene around 4:00 a.m.; one officer "made [him] aware of a set of keys that he had seen in the grass" and another "secure[d] [the keys] for evidence purposes."  At some point around the time the key ring was found, he and other officers were standing in

_____

[10] Reese also argues that, had the trial court suppressed the key ring, shell casings, and evidence that surveillance cameras were affixed to Reese's house, two warrants relying on those items to establish probable cause to search his house would have been invalid, so the fruits of the search pursuant to those warrants—i.e., the surveillance recordings, marijuana, a scale, and cash, among other things—also would have been suppressed.  But because we conclude that Reese has failed to show that any of the evidence establishing probable cause to search his house would have been suppressed, we need not address this argument.

Reese's front yard, which was visible from two public streets. Although his back yard was fenced, his front yard was not. Nor was there "any type of privacy screen or anything else" blocking the yard from view.

Detective Rittberg conducted a "grid search" of Reese's front yard "after 5:04 [a.m.]," around two hours after the shooting, and conducted a "grass canvas" with another officer sometime between 5:00 a.m. and 5:57 a.m. Between 7:30 a.m. and 7:40 a.m., a different officer found two shell casings; they were found "in close proximity" to the key ring that was lying in the grass in Reese's yard. The two shell casings and the key ring were found near what Detective Rittberg called a dirt "pad" in Reese's yard leading to the steps to his front porch.

Detective Rittberg also testified about the surveillance cameras on the outside of Reese's house. Reese's counsel asked if he observed the cameras while walking through Reese's yard, and Detective Rittberg responded that his memory was that the cameras were "plainly visible from the street."

In its order denying Reese's motion for a new trial, the trial court expressly found that Reese's "home was on the corner of two public streets and could be viewed by pedestrians on both streets," and that his "front yard was not surrounded by a fence, gate, [or] privacy screen." It further found that Reese did not "attempt in any other way to obscure the front yard from view," and concluded that Reese's yard was not used as an extension of the home.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Generally speaking, this means that law enforcement officials must obtain a warrant before conducting a search that falls within the Fourth Amendment's parameters. See *Tidwell v. State*, 312 Ga. 459, 464 (863 SE2d 127) (2021). But the Fourth Amendment is not implicated in "all investigations conducted on private property." See *Florida v. Jardines*, 569 U.S. 1, 6 (133 SCt 1409, 185 LE2d 495) (2013) (citing *Hester v. United States*, 265 U.S. 57 (44 SCt 445, 68

28

LE 898) (1924)).  To the contrary, the Fourth Amendment "'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects."  *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 176 (104 SCt 1735, 80 LE2d 214) (1984)).

The Fourth Amendment's protection of "houses" includes areas surrounding a house to the extent that the area is properly classified as curtilage.  See *Oliver*, 466 U.S. at 180.  "[F]or Fourth Amendment purposes," curtilage is considered "part of the home itself," id., and is defined as "the area 'immediately surrounding and associated with the home.'"  *Jardines*, 569 U.S. at 6 (quoting *Oliver*, 466 U.S. at 180).  The Supreme Court in *United States v. Dunn*, 480 U.S. 294, 301 (107 SCt 1134, 94 LE2d 326) (1987),  laid out four factors for courts to "reference" when answering "curtilage questions": "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing

29

by." That said, the factors are "useful analytical tools only to the degree that" they bear upon "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection"; "mechanically" applying the factors is not a guaranteed method of reaching the "'correct' answer to all extent-of-curtilage questions." Id. See also *Peacock v. State*, 314 Ga. 709, 719 (878 SE2d 247) (2022).

Reese has failed to show that a motion to suppress based on his proposed curtilage argument would have been successful. See *Tabor*, 315 Ga. at 249 ("Where, as here, an appellant claims that trial counsel was deficient for failing to file a motion to suppress, the appellant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion.") (cleaned up). To start, despite Reese's arguments to the contrary, Reese has not shown that officers were in his yard, or on any of his property for that matter, when they discovered the surveillance cameras. To the contrary, Detective Rittberg testified at the motion-for-new-trial hearing that, to the best of his memory, the

30

surveillance cameras were "plainly visible from the street." Reese has pointed to no contradictory evidence. Because this aspect of his claim rested on the premise that officers were in Reese's yard when they first noticed the surveillance cameras attached to Reese's house, that aspect of his claim fails.

As for the key ring and shell casings, Reese has failed to make a "strong showing" that those items would have been suppressed based on his argument that the officers who found those items without a warrant did so in an area that was curtilage. *Tabor*, 315 Ga. at 249. Pictures admitted into evidence at trial indicate that the key ring and shell casings were found in close proximity to Reese's house, but no evidence was admitted regarding the exact distance between the house and the area of his yard where the key ring and shell casings were found, and Reese did not offer evidence about what the relevant area of his yard was used for. On this score, the trial court concluded that Reese's "front yard was not used as an extension of the home." Moreover, Reese's front yard was on the corner of two public streets and the trial court found that it "could

be viewed by pedestrians on both streets," that Reese's "front yard was not surrounded by a fence, gate, [or] privacy screen," and that "Reese did not attempt in any other way to obscure the front yard from view."

At bottom, Reese introduced very little evidence in support of this claim at the motion-for-new-trial hearing, and the only fact that the trial court might have weighed in favor of the relevant area of Reese's yard being curtilage was its proximity to Reese's house.[11] But that proximity was never quantified, and we cannot conclude that uncertain proximity by itself so clearly established that the relevant area of Reese's yard "is so intimately tied to the home itself" such that the key ring and shell casings likely would have been suppressed had his trial counsel moved to exclude them. *Dunn*, 480 U.S. at 301. See also *United States v. French*, 291 F3d 945, 952 (7th Cir. 2002) ("[P]roximity to the home, standing by itself, does not per

---

[11] To be clear, we do not hold that the type of area where the key ring and shell casings were found could never be curtilage, but rather that Reese has not met his burden, in the context of an ineffective-assistance claim, to make the required "strong showing" that the evidence would be suppressed based on the theory that the area was curtilage. *Tabor*, 315 Ga. at 249.

se, suffice to establish an area as within the curtilage.") (citing *Oliver*, 466 U.S. at 182 n.12); *Jardines*, 569 U.S. at 6 (curtilage is the area "immediately surrounding and *associated* with the home") (quoting *Oliver*, 466 U.S. at 180) (emphasis supplied); *United States v. Duenas*, 691 F3d 1070, 1081 (9th Cir. 2012) (front yard was not curtilage when the only factor suggesting the front yard was curtilage was proximity, and "[t]he front yard was not enclosed; there was no evidence as to how the yard was used; nor was there any evidence that the [defendant] tried to protect the yard from observation"). Accordingly, Reese has failed to show that his trial counsel was constitutionally deficient in failing to file a motion to exclude the key ring and shell casings. See *Tabor*, 315 Ga. at 249 (to establish trial counsel was deficient in this context, "the appellant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion") (cleaned up); *Ward v. State*, 313 Ga. 265, 275 (869 SE2d 470) (2022) (trial counsel was not ineffective in failing to file a motion to suppress because it "would not clearly have succeeded").

(b) Reese contends his trial counsel provided ineffective assistance of counsel by failing to request an accomplice-corroboration charge. His claim fails because, as discussed above in Division 3, Reese has failed to show that slight evidence supported an inference that Reese and Bell were accomplices to the charge of possession of marijuana with the intent to distribute. Therefore, Reese has not shown his trial counsel was constitutionally deficient for failing to request an accomplice-corroboration instruction. See *Matthews v. State*, 311 Ga. 531, 545 (858 SE2d 718) (2021) ("the failure to make a meritless motion or objection" is not constitutionally deficient) (cleaned up).

(c) Reese argues that his trial counsel provided ineffective assistance by not objecting to an allegedly improper sequential jury instruction. Reese has failed to show his trial counsel was constitutionally deficient for not objecting to this instruction.

The trial court provided the jury the following instructions about filling out the verdict form:

If, after considering the testimony and evidence presented to you, together with the charge of the court, you should find and believe beyond a reasonable doubt that the Defendant in Fulton County, Georgia, did on or about August 19, 2015, commit the offense of murder, as alleged in count 1 of the indictment, you would be authorized to find the Defendant guilty. In that event, the form of your verdict would be, "We, the jury, find the Defendant guilty of murder."

If you do not believe that the Defendant is guilty of murder, or if you have any reasonable doubt as to the Defendant's guilt, then it would be your duty to acquit the Defendant, in which event, the form of your verdict would be, "We, the jury, find the Defendant not guilty of murder."

For each of the following counts, counts 2 through 9 of the indictment, you should follow the same procedure as described above as to each of said counts.

You must make a determination as to each count separately.

. . .

Whatever your verdict is, it must be unanimous, that is, agreed to by all of you. The verdict must be in writing and signed. . . .

. . .

You'll have the verdict form out with you. There are, you know, nine different counts. And as I've instructed you, you're to consider each one separately.

And in count 1, it has, we, the jury, find the Defendant Larry Reese — and the first entry is guilty of murder.

If you believe the State proved murder beyond a reasonable doubt, you would check that.

And if you don't find that the State has carried the burden of proof on murder, but one of the — you need to

determine whether the Defendant is guilty of the lesser included offense of involuntary manslaughter. And if you find such, you should check that.

And if you find that the State has failed to prove the Defendant's guilt beyond a reasonable doubt, then you would check number 3, not guilty of murder.

And the same goes for felony murder. There's also a lesser included offense here. You need to consider the felony murder first. If you don't find that, then you would consider involuntary manslaughter. If you don't find that, then it would be not guilty of murder.

So you follow that course with each count.

"[W]hen the evidence presented in a criminal trial warrants a jury instruction on a lesser-included offense," a trial court violates the rule against impermissible sequential jury instructions "if it instructs the jury that it may consider the lesser offense only if it first unanimously finds the defendant not guilty of the indicted greater offense." *Stewart v. State,* 311 Ga. 471, 473-474 (858 SE2d 456) (2021). Reese contends the trial court ran afoul of this rule when it instructed the jury to "consider the felony murder first. If you don't find that, then you would consider involuntary manslaughter."

*Stewart* is instructive here. In *Stewart*, the appellant contended that the verdict form the trial court provided the jury in

36

his case "constituted an improper sequential jury instruction" because "the trial court instructed the jury of only one circumstance when it could 'render verdict' as to the lesser offense . . . : if it first reached a 'verdict,' which the recited instructions and the verdict form specified must be 'unanimous,' of 'not guilty'" on the indicted offenses. Id. at 473, 475. The appellant argued that the trial court plainly erred in giving that instruction and that his trial counsel rendered ineffective assistance of counsel for not objecting to it. See id. at 475-476.

We were unpersuaded. We noted that the appellant had "cite[d] only one appellate case that actually reversed a conviction based on an improper sequential jury instruction"—*Kunselman v. State*, 232 Ga. App. 323 (501 SE2d 834) (1998)—and distinguished the facts of *Kunselman* from the appellant's. See *Stewart*, 311 Ga. at 476 ("In *Kunselman*, the Court of Appeals rejected an instruction that, if the jury found the defendant not guilty of the indicted offense, it would 'then and only then be authorized to consider the lesser included offense.' The instructions in this case did not

37

expressly prohibit the jury from considering the lesser offense unless it first unanimously found Stewart not guilty of the greater offenses."). And we concluded that the appellant's ineffective assistance of counsel claim failed because he did not show that, "under existing precedent," "the verdict form clearly constituted an improper sequential jury instruction." Id. at 477.

Here, like the appellant in *Stewart*, the only case Reese cites reversing a conviction based on an improper sequential jury instruction is *Kunselman*.[12] And unlike in *Kunselman*, the trial court in this case did not "expressly prohibit the jury" from considering the lesser included offenses until after it reached a unanimous verdict on the indicted offenses. See *Stewart*, 311 Ga. at 476. To the contrary, the trial court's instruction in this case better resembles jury instructions we have concluded were not improper than it resembles the sequential instruction in *Kunselman*. See,

_____

[12] Reese also cites *Cantrell v. State*, 266 Ga. 700 (469 SE2d 660) (1996), but that case did not involve an improper sequential jury instruction. Instead, the trial court rejected a jury's guilty verdict on a lesser included offense because the jury had not reached a verdict on the indicted offense. See id. at 703.

e.g., *Yeager v. State*, 274 Ga. 216, 219 (552 SE2d 809) (2001) ("The jury was instructed to consider the lesser offense of involuntary manslaughter only if they did not believe beyond a reasonable doubt that appellant was guilty of malice murder."); *Camphor v. State*, 272 Ga. 408, 414 (529 SE2d 121) (2000) ("Should you find the defendant not guilty of the crime of burglary, you would be authorized to consider under the evidence whether or not he did, at said time and place, commit the lesser offense of criminal trespass"). See also *Arrington v. Collins*, 290 Ga. 603, 608 (724 SE2d 372) (2012) (appellate counsel not constitutionally deficient for not raising a sequential jury instruction argument when the trial court instructed the jury "'that it could consider the lesser-included offense of simple possession if it first found [the defendant] not guilty of trafficking'" because that instruction was "not substantially different from charges which have been upheld on appeal").

Reese has "not shown under existing precedent" that the jury instructions he points to "clearly constituted an improper sequential jury instruction." See *Stewart*, 311 Ga. at 477. And because an

39

objection to this instruction would have been unsuccessful, Reese's trial counsel did not perform deficiently when he did not object. See *Matthews*, 311 Ga. at 545 ("the failure to make a meritless motion or objection" is not constitutionally deficient) (cleaned up).[13]

*Judgment affirmed. All the Justices concur.*

---

[13] Reese also argues that the cumulative effect of the errors the trial court committed affected the outcome of his trial. See *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020). However, we have assumed only one error and identified no others, so this claim presents nothing additional for us to review. See id. at 17.

Decided August 21, 2023 — Reconsideration denied September 6, 2023.

Murder. Fulton Superior Court. Before Judge Dunaway.

*Matthew K. Winchester*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Alex M. Bernick, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.