## S10A0173. BELL v. THE STATE.
(697 SE2d 793)

NAHMIAS, Justice.

Willie Bell appeals from his convictions by a Mitchell County jury of malice murder, armed robbery, and burglary arising from the stabbing death of 79-year-old James Marvin Crosson.[1] Bell contends, among other things, that the evidence is insufficient to support his convictions for armed robbery and burglary. We agree that the evidence is insufficient to support those convictions, but we find no merit to Bell's other contentions and affirm his conviction for malice murder.

1. Viewed in the light most favorable to the verdict, the evidence at trial showed as follows. On the morning of June 25, 2001, Crosson's housekeeper arrived at his apartment. The front door was not locked, and when she pushed it open, she saw Crosson lying on the floor. Emergency medical personnel soon arrived and determined that Crosson was dead. He had been stabbed numerous times in the chest, with two of the stab wounds being fatal; the wounds were consistent with having been caused by a pocketknife.

There was no sign of forced entry into the residence. Crosson was holding a telephone in his hand when he died, and telephone records showed that, at 10:12 p.m. on June 24, he dialed "0," but the call never connected. Crosson's front and back pockets had been turned inside out and no wallet was found in the pockets.

Bell's girlfriend, Sarah Perry, who was still close to him at the time of trial, testified that in the afternoon of June 24, she and Bell were driving around when they saw Crosson outside his apartment. Bell knew Crosson because his father had worked for Crosson for 11 years, and he asked Crosson if he could borrow a quart of oil for Perry's car. After getting the oil, Bell and Perry left. They returned to the area of Crosson's apartment around 9:30 that night to visit

---

[1] Bell committed these crimes on June 24, 2001. He was indicted on January 3, 2002, and was found guilty by the jury on April 23, 2003. The trial court sentenced Bell to life in prison for malice murder, life in prison for armed robbery, and 20 years in prison for burglary, all running concurrently to each other but consecutive to a sentence Bell was already serving for a previous murder conviction. Bell filed a motion for new trial on May 14, 2003, which was amended on September 5, 2006, and February 27, 2008. The trial court held an evidentiary hearing on February 4, 2009, and denied the motion on September 18, 2009. Bell's timely appeal was docketed in this Court for the January 2010 Term, and the case was subsequently submitted for decision on the briefs.

Bell's aunt. Perry and Bell had an argument while they were driving, however, and she dropped Bell off close to Crosson's apartment so that they could both cool off. She drove around for a few minutes and then picked Bell up near where she had left him.

At trial, Perry denied that Bell had ever told her that he had stabbed someone, but she said that, when they were later discussing Crosson's death, he asked her if she had ever known or dated someone that would stab another person. She claimed that Bell made this statement in the context of the two of them trying to determine if they knew someone who may have killed Crosson.

On cross-examination, Perry testified that, when Bell came back to the car, he did not have any blood on him, and she did not see him with any wallet or money. Perry denied telling police investigators a few months after the crime that Bell had told her he had stabbed somebody. However, a sheriff's office investigator testified that he interviewed Perry three times on October 29-30, 2001, and that Perry said that Bell told her he had stabbed somebody. The investigator also testified that Perry told him that she dropped Bell off near Crosson's home on the night of the crime about 10:15 to 10:30 p.m.

Bell also talked about the murder with a long-time friend, Cavatina Almond. Bell explained to Almond that his father drove trucks for Crosson, that he had gotten into an argument with Crosson about money, and that he ended up stabbing Crosson with a pocketknife.

A few months after Crosson was murdered, on October 27, 2001, Bell hitched a ride with Jermaine Williams and Arthur Brown. Brown was driving, Williams was in the passenger seat, and Bell was in the back seat. Halfway to their destination, Bell attacked Williams from behind, slashing his throat and stabbing him twice in the back. As Brown slowed down, Williams jumped out of the car and ran away as he heard Brown screaming for help. Bell stabbed Brown repeatedly in the chest, killing him, and then fled in the vehicle. Bell's bloody clothes were later found hidden in a culvert near his father's house, and boxer shorts with Brown's blood on them were found beside Bell's bed.

On January 3, 2002, the grand jury handed down separate indictments charging Bell with both the June 24, 2001 crimes and the October 27, 2001 crimes. The Brown murder case was tried first, and the jury convicted Bell of murder, aggravated assault against Williams, and theft by taking of a motor vehicle. This Court affirmed those convictions before the trial of this case began. See *Bell v. State*, 276 Ga. 206 (576 SE2d 876) (2003). At the Crosson murder trial, over Bell's objection, the trial court permitted the State to present evidence of the October 27, 2001 crimes, including the verdict form from that trial, as similar transaction evidence.

(a) Viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find the defendant guilty beyond a reasonable doubt of the crime of malice murder. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)). Bell does not contend otherwise, but he does argue that the evidence was insufficient to support the armed robbery and burglary convictions. We agree.

(b) The armed robbery count of the indictment charged that Bell,

> with the intent to commit a theft, [did] take a billfold, an undetermined amount of United States Currency, and a Citibank Mastercard issued by the Planters and Citizens Bank, the property of James Marvin Crosson, from the person of James Marvin Crosson, by use of an offensive weapon, to wit: a knife.

See OCGA § 16-8-41 (a) (setting forth the crime of armed robbery, including the element that the defendant must "take[ ] property of another from the person or the immediate presence of another"). The indictment suggests that the State had some reason to believe that Crosson had and Bell took the specified property. However, the State did not present any evidence at trial that Crosson owned a billfold or a Mastercard, that he had those items or any cash on his person or in his home at the time of the crime, or that any such property was missing from the home after the crime. Nor was there any evidence that, after the crime, Bell possessed a billfold, credit card, or money that did not belong to him.

The fact that Crosson's pants' pockets were found inside out is evidence that Bell *intended* to commit a theft from Crosson, but there is simply no evidence in the record showing or supporting a reasonable inference that Bell actually *took* any property. Because the State failed to prove that Bell took any property from Crosson as charged in the indictment, we reverse the armed robbery conviction. See *Dillard v. State*, 251 Ga. 858, 858 (310 SE2d 518) (1984) (reversing armed robbery conviction because the State failed to prove that any money was taken as charged).

(c) The burglary count of the indictment charged that Bell, "without authority and with intent to commit a theft therein, enter[ed] the dwelling house of [Crosson]." See OCGA § 16-7-1 (a) (setting forth the crime of burglary, including that the defendant,

"without authority and with the intent to commit a felony or theft therein, . . . enters or remains within the dwelling house of another"). Even assuming that the evidence at trial showed that Bell intended to commit a theft when he first entered Crosson's residence, there was no evidence that Bell entered the home "without authority." There was no indication, for example, that Bell forced his way in or that Crosson denied Bell permission to enter. One may speculate otherwise, but given that Bell's father had worked for Crosson for many years, that Bell and Crosson knew each other and had spoken earlier that same day, with Crosson lending some oil to Bell, and that there was no sign of forced entry, there is reason to believe that Crosson allowed Bell to enter his apartment. Indeed, the prosecutor argued this position in closing, asserting in support of the malice murder count that Crosson let Bell into the apartment "because they knew each other." The evidence that, once inside the apartment, Bell assaulted Crosson and sought to rob him would support a conviction for "remain[ing]" in the dwelling without authority, OCGA § 16-7-1 (a), but that portion of the burglary statute was neither charged in the indictment nor included in the jury instructions in this case. Because the evidence did not prove that Bell entered Crosson's home without authority, we also reverse the burglary conviction. See *Thompson v. State*, 271 Ga. 105, 106, 108 (519 SE2d 434) (1999) ("categorically reject[ing] the position that the element of an unlawful entry [for burglary] may be established solely by proof that an accused had the intent to commit a theft or other felony within another's premises" and reversing a burglary conviction because the State failed to prove an unauthorized entry into the victim's house).

2. Bell contends that the trial court erred in permitting the State to introduce a certified copy of the verdict form from the Brown murder case as evidence of that similar transaction. Bell contends that court records of a similar transaction, including certified copies of verdict forms and convictions, are not relevant to prove the similar transaction and are unduly prejudicial. We disagree.

We note that the jury's verdict in the Brown case generally would not be considered the equivalent of a conviction. See OCGA § 16-1-3 (4) (defining "conviction" as "a final judgment of conviction entered upon a verdict or finding of guilty of a crime or upon a plea of guilty"). However, at the time the trial court decided to admit the verdict form from the Brown case, final judgment had been entered on that verdict and this Court had affirmed the conviction on direct appeal. While the trial court could have admitted the certified copy of that conviction, it decided to permit the introduction of only the verdict form so that the jury in this case

would not learn of the sentences imposed on Bell in the Brown case. Under these circumstances, we treat the certified copy of the verdict form like a certified conviction.

This Court and the Court of Appeals have held that, although a certified copy of a prior conviction generally is not sufficient, by itself, to prove the similarity of another crime, it is relevant evidence of that crime when taken together with testimony or other evidence regarding that crime. See, e.g., *Rose v. State*, 275 Ga. 214, 216 (563 SE2d 865) (2002); *Burgess v. State*, 264 Ga. 777, 784 (450 SE2d 680) (1994); *Nelson v. State*, 242 Ga. App. 63, 65 (528 SE2d 844) (2000). As demonstrated by the repeated approval of the use of certified convictions in proving similar transactions, such evidence is probative and is not per se unduly prejudicial. See *United States v. Walker*, 428 F3d 1165, 1170 (8th Cir. 2005) (rejecting contention that using a certified conviction to prove a similar transaction is unduly prejudicial because it " 'gives a court's imprimatur upon the defendant's past criminality,' " explaining that "[a] certified conviction is the best evidence of what occurred, . . . and it can be less prejudicial to a defendant than other forms of proof since it recites only the 'bare bones' fact of conviction rather than giving any details of the crime."). The trial court here did not abuse its discretion in admitting the certified copy of the verdict form along with testimony from the surviving victim.

3. Finally, Bell contends that his trial counsel was constitutionally ineffective, arguing that (1) trial counsel should have prevented the surviving victim of the similar transaction from testifying; (2) counsel should have investigated whether Almond was paid $5,000 for her testimony; (3) counsel failed to secure exculpatory evidence from two witnesses; (4) counsel unduly influenced Bell to testify at trial; and (5) the trial court's refusal to appoint Bell new counsel when he expressed his disapproval of trial counsel amounted to a constructive denial of counsel. To prevail on this claim, Bell must show that his trial counsel provided deficient performance and that, but for that unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. See *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SC 2052, 80 LE2d 674) (1984). In examining an ineffectiveness claim, a court need not "address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697.

Analyzed under these standards, Bell's claims of ineffective

assistance are wholly without merit.[2] First, although Bell's counsel sought to exclude it, the evidence of the similar transaction was properly admitted at trial and the testimony of the surviving victim was clearly admissible evidence of those similar criminal acts. Trial counsel cannot be deficient in failing to object to the admission of legally admissible testimony. Second, at the motion for new trial hearing, Bell offered no admissible evidence that Almond had been offered $5,000 for her testimony, and therefore he has not shown any prejudice. See *Dickens v. State*, 280 Ga. 320, 322-323 (627 SE2d 587) (2006) (holding that, to demonstrate prejudice for the alleged failure to elicit testimony, the defendant may not rely on hearsay or speculation but must either call the witness or "introduce a legally recognized substitute for the uncalled witness's testimony"). Third, with regard to the two witnesses who allegedly could have offered exculpatory evidence if trial counsel had called them to testify, Bell did not offer any evidence at the motion for new trial hearing as to whether the witnesses would have testified, offered only speculation as to the possible testimony of one of the witnesses, and did not offer even speculation about the possible testimony of the other witness. He again has shown no prejudice. See id. Fourth, the record demonstrates that trial counsel and the trial court clearly informed Bell that the decision to testify was his alone and that Bell stated that it was his choice to testify. Finally, the record shows that Bell never expressed dissatisfaction with his counsel at trial and in fact, when the trial court asked Bell whether he was satisfied with counsel at the end of the State's case, Bell responded that he was "very satisfied."

---

[2] Following his conviction, Bell's trial counsel filed a motion for new trial, and Bell filed a pro se motion seeking to raise a claim of ineffective assistance of trial counsel. The trial court appointed new counsel for Bell, reasoning that Bell's claims of ineffective assistance of trial counsel would be waived if not asserted before the trial court and then raised on appeal. New appellate counsel amended the motion for new trial but did not include an ineffective assistance of trial counsel claim, explaining to the trial court that in his judgment, there were no instances or issues of such ineffective assistance. At Bell's behest, however, the trial court appointed a second new appellate counsel for Bell, who filed a second amended motion for new trial asserting ineffective assistance of trial counsel. The trial court conducted an evidentiary hearing on February 4, 2009. At the hearing, the second new appellate lawyer asked the court for clarification regarding his duties when a defendant raises an ineffectiveness claim that counsel does not think, in his or her professional judgment, has any merit. The trial court ruled that the record was already sufficient for this Court to address the problem.

As a recent decision of this Court has clarified, see *Williams v. Moody*, 287 Ga. 665 (697 SE2d 199) (2010), the trial court erred by requiring appellate counsel to raise claims of ineffective assistance even though counsel found no merit to them, simply because the defendant wanted the claims to be asserted. Appellate counsel controls the issues to be raised on appeal; a defendant's pro se motion seeking to raise an ineffectiveness claim while still represented by counsel is a nullity; and the defendant does not waive review of an ineffectiveness claim against the lawyer whose ineffectiveness is at issue as long as that lawyer's representation continues. See id. at 669.

For these reasons, we find no merit to Bell's claims of ineffective assistance of trial counsel.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED JULY 12, 2010.

*Little & Crumly, Samuel F. Little, Jr.,* for appellant.

*Joseph K. Mulholland, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellee.