S11A0372. JIMMERSON v. THE STATE.

(711 SE2d 660)

HUNSTEIN, Chief Justice.

Following a jury trial, appellant Miles Jimmerson a/k/a Jimmerson Miles was convicted of malice murder, felony murder (two counts), aggravated assault (two counts), aggravated battery, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony in connection with a March 2004 shooting in which Charles Wilcoxson was killed and Kevin Colbert was injured. Jimmerson appeals from the denial of his motion for new trial,[1] challenging the sufficiency of the evidence and arguing that he received ineffective assistance from his trial counsel. Dis-

---

[1] The crimes occurred on March 16, 2004, and a Fulton County grand jury returned a true bill of indictment against Jimmerson on August 24, 2004, charging him with malice murder, two counts of felony murder (based on aggravated assault and possession of a firearm by a convicted felon), two counts of aggravated assault with a deadly weapon, aggravated battery, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. Jimmerson was tried before a jury beginning April 18, 2005, and the jury returned a verdict of guilty on all counts on April 20, 2005. On April 21, 2005, the trial court sentenced Jimmerson to life in prison for malice murder plus a consecutive term of twenty years for aggravated battery and a consecutive term of five years for possession of a firearm during the commission of a felony. The felony murder convictions were vacated by operation of law, *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993), and the remaining convictions merged for sentencing purposes. Jimmerson's motion for new trial, filed April 26, 2005 and amended March 11, 2008 and June 1, 2009, was denied December 18, 2009. A notice of appeal was filed on December 22, 2009. The appeal was docketed to the January 2011 term in this Court and submitted for decision on the briefs.

cerning no error, we affirm.

1. The evidence at trial authorized the jury to find that on the evening of March 16, 2004, Yosheka Jeffries became involved in an argument with Wilcoxson, whom she had dated on and off for several years, and Colbert after the two men borrowed her car and failed to return it until after 9:00 p.m. Wilcoxson and Colbert attempted to leave Jeffries' house in Colbert's car, and Wilcoxson backed into Jeffries' car, which was blocking Colbert's car into the driveway. Jeffries told her sister to call the police, and attempting to keep the men from leaving, she got into the front seat with Wilcoxson, who drove away through the yard while Jeffries' legs were hanging out of the car. Wilcoxson drove Jeffries to a park, where he choked her and threatened to kill her for calling the police, and then to a cemetery, where Colbert threatened her with a gun. After departing from the cemetery, Wilcoxson spoke with Jeffries' brother on Jeffries' mobile phone and agreed to bring Jeffries to her father's house. Wilcoxson stopped at his house on the way there and told Colbert to get out and get some guns and a bullet proof vest.

When Wilcoxson arrived at Jeffries' father's house, Jeffries' father and brother came outside. Colbert got out of the car with the handle of a gun visible in his back pocket. Jeffries' brother tried to check the car because Jeffries told him that Wilcoxson and Colbert had guns and bullet proof vests, but Wilcoxson assured him that everything was all right. After Jeffries' father went back inside, Jimmerson walked up. Jimmerson lived in vacant houses in the same neighborhood as Jeffries, and she sometimes provided Jimmerson with food and necessities. Jeffries testified that as she stood in the street facing Wilcoxson and her brother, she heard gunshots and saw Colbert fall into the side of the car. She then turned back toward Wilcoxson, who was immediately struck by bullets and fell to the ground. Jeffries stated that after Wilcoxson hit the ground, she saw Jimmerson with a gun, still shooting down at Wilcoxson and then Colbert. Jeffries admitted, however, that she gave a statement shortly after the shootings in which she stated that she could not say definitely who shot the victims. Jeffries' brother testified that he dropped to the ground when the shooting began. He did not see the shootings, but he saw Jimmerson with a gun when Jimmerson was running off.

Jimmerson, who elected to testify, stated that he was walking around near Jeffries' father's house when he heard arguing in the street. He heard Jeffries ask Wilcoxson why he choked her and also heard her tell her brother that "they got guns and bullet proof vests in the car." Jimmerson testified that he approached the group to try to calm things down and told Wilcoxson, "you ain't got to treat no lady like that." According to Jimmerson, Wilcoxson cursed at him

and Colbert frowned and tried to pull a gun out of his back pocket, so he grabbed Colbert's gun with his right hand, pushed Colbert back, and seized the gun; when Colbert rushed back at him like he wanted to grab the gun, he shot Colbert. Jimmerson testified that he also shot Wilcoxson because Wilcoxson was running toward the trunk and he feared Wilcoxson would retrieve a gun and kill him.

Wilcoxson died at the scene. The medical examiner who conducted an autopsy on Wilcoxson testified that Wilcoxson sustained five gunshot wounds and that Wilcoxson's death resulted from a gunshot wound to his head and/or two gunshot wounds to his torso. Colbert sustained a gunshot wound to the neck that injured his cervical spine and spinal cord. Police did not find any bullet proof vests or guns in Colbert's car. A certified copy of Jimmerson's 2002 felony conviction for theft by taking was admitted into evidence.

Jimmerson argues that his conviction for aggravated battery cannot stand because the State did not prove the type of bodily harm alleged in the indictment. A person commits aggravated battery, inter alia, when "he or she maliciously causes bodily harm to another . . . by rendering a member of his or her body useless." OCGA § 16-5-24 (a). The indictment alleged that Jimmerson shot Colbert with a firearm, thereby rendering Colbert's legs useless.

The testimony and medical records admitted into evidence at trial established that Colbert was hospitalized for over a month following the shooting and was then transferred to a traumatic care hospital where he received rehabilitation services on an inpatient basis and through a day program. The orthopedic surgeon who served as Colbert's attending physician during the day program testified that Colbert's neck injury caused him to be "quadriplegic, which means that he was having problems with moving his upper extremities, he was having problems moving his lower extremities." He stated that Colbert lost significant function in his left arm and that the muscles in his lower extremities were weakened, affecting Colbert's gait. He testified that Colbert's ability to walk improved during his treatment but that Colbert was limited to walking at slower speeds. Colbert's medical records indicate that he required a number of weeks of therapy in May and June of 2004 to be able to stand, balance, and ambulate. The evidence regarding Colbert's rehabilitation and his ongoing gait impairment was sufficient to allow the jury to conclude that Colbert's legs were rendered useless. See *Baker v. State*, 245 Ga. 657 (6) (266 SE2d 477) (1980) (evidence that victim lost use of jaw until fracture healed was sufficient to establish that member of her body was rendered useless).[2]

---

[2] See also *In the Interest of A. D.*, 295 Ga. App. 750 (673 SE2d 116) (2009) (evidence that

Jimmerson next claims that the evidence was insufficient to overcome his justification defense. See *Daniley v. State*, 274 Ga. 474 (1) (554 SE2d 483) (2001) (describing State's burden of disproving justification defense beyond a reasonable doubt).

> [A] person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

OCGA § 16-3-21 (a). "A homicide is not justified if the force used by the defendant exceeds that which a reasonable person would believe was necessary to defend against the victim's unlawful act. [Cit.]" *Nelson v. State*, 283 Ga. 119, 120 (1) (657 SE2d 201) (2008). Even if it accepted Jimmerson's version of events preceding the shooting, the jury was authorized to conclude that, having wrested control of Colbert's gun, Jimmerson used excessive force in shooting the two unarmed victims and/or in continuing to fire at them after the victims had fallen to the ground.[3] Viewed in the light most favorable to the verdict, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Jimmerson did not act in self-defense and that Jimmerson was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Jimmerson alleges that his trial counsel was ineffective in a number of respects. To succeed on this claim, Jimmerson must show that his trial counsel's performance was professionally deficient and that, but for such deficient performance, a reasonable probability exists that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Jimmerson failed to meet this burden.

(a) Jimmerson claims that his trial counsel did not prepare adequately for trial, provide adequate advice, or present an adequate defense. At the motion for new trial hearing, Jimmerson testified that he told his trial counsel "from the get-go that I did not do

---

juvenile tackled mother and injured her knee such that she could not apply pressure to it and had to use crutches for three weeks authorized conclusion that knee was rendered useless); *Daniel v. State*, 271 Ga. App. 539 (1) (610 SE2d 90) (2005) (evidence that, as result of gunshot wound to hip, victim was required to use crutches for six months and still used cane was sufficient to establish that member of victim's body was rendered useless).

[3] Despite any discrepancies between Jeffries' initial statement to police and her trial testimony, the jury was entitled to credit Jeffries' testimony at trial that she observed Jimmerson firing down at the two victims on the ground. See *Knight v. State*, 271 Ga. 557 (1) (521 SE2d 819) (1999) (witness credibility is a matter to be determined by the jury).

anything," trial counsel advised him that asserting self-defense was the "easy way for me to get off," but the trial did not go "the way it was supposed . . . to go." Jimmerson did not testify that he provided trial counsel with any evidence or information supporting his claim that he was not involved in the shootings. Jimmerson's trial counsel testified that Jimmerson initially told him that "he did not do it"; however, he concluded from the evidence that it was a self-defense case, he consulted with Jimmerson, and they both agreed on a self-defense strategy.

The trial court was entitled to credit trial counsel's testimony that he and Jimmerson had agreed upon a self-defense theory. See *Henderson v. State*, 285 Ga. 240 (2) (a) (675 SE2d 28) (2009). In view of the strength of the evidence implicating Jimmerson in the shootings, we agree with the trial court that Jimmerson failed to show that his trial counsel's choice of strategies was unreasonable, and, thus, ineffective. See *Fuller v. State*, 278 Ga. 812 (2) (c) (607 SE2d 581) (2005) (matters of reasonable trial strategy do not amount to ineffective assistance). The fact that Jimmerson, in hindsight, now questions the efficacy of the chosen defense strategy cannot establish ineffective assistance. See *Johnson v. State*, 282 Ga. 235 (2) (647 SE2d 48) (2007).

Jimmerson also complained at the motion for new trial hearing that his trial counsel never brought up the fact that in her initial statement to police, Jeffries stated that she did not know who shot the victims. This contention is meritless, as the record reflects that Jimmerson's trial counsel cross-examined Jeffries and other witnesses about that portion of Jeffries' initial statement.

(b) Jimmerson argues that his trial counsel performed deficiently by failing to move to strike certain jurors for cause despite expressing concerns about them. The record contradicts this claim and reflects that Jimmerson's trial counsel, in fact, moved to strike the jurors in question and noted the trial court's denial of the strikes for the record.

(c) Jimmerson contends that after the trial court alluded to the recent courthouse shootings by Brian Nichols while admonishing a courtroom deputy, his trial counsel should have asked the trial court to poll the jurors to determine whether the trial court's remarks affected their neutrality. When asked at the motion for new trial hearing why he did not either ask that the jury be polled or request a cautionary instruction, Jimmerson's trial counsel responded that he would not have wanted to draw extra attention to the issue. Trial counsel's decision in this regard constituted reasonable trial strategy and does not evidence deficient performance. See *Phillips v. State*, 285 Ga. 213 (5) (c) (675 SE2d 1) (2009); *Milner v. State*, 271 Ga. 578 (2) (522 SE2d 654) (1999).

(d) We find no merit in Jimmerson's claim that his trial counsel was deficient in failing to renew Jimmerson's motion for a directed verdict of acquittal as to the aggravated battery charge at the close of all the evidence. Given our holding in Divison 1 that the evidence at trial authorized Jimmerson's convictions, trial counsel would not have been ineffective had he failed to move for a directed verdict when the State rested. *Nelson v. State*, 285 Ga. 838 (2) (684 SE2d 613) (2009); *Jones v. State*, 278 Ga. 880 (608 SE2d 229) (2005). Likewise, failure to renew a non-meritorious motion for directed verdict provides no ground for claiming ineffective assistance of counsel.

(e) Jimmerson argues that his trial counsel was ineffective because he failed to request a charge on voluntary manslaughter and was not open to the possibility of a compromise verdict. Even assuming arguendo that the evidence would have authorized a voluntary manslaughter charge, we disagree. Trial counsel testified that he conferred with Jimmerson and Jimmerson "did not want me to compromise, to present basically a manslaughter defense. It was sort of an all or nothing [case]." Because trial counsel made a reasonable strategic decision, after consulting with Jimmerson, not to request a charge on voluntary manslaughter or argue for a compromise verdict, his performance cannot be deemed deficient. See *McKee v. State*, 277 Ga. 577 (6) (a) (591 SE2d 814) (2004); *Canada v. State*, 275 Ga. 131, 133 (2) (562 SE2d 508) (2002).

(f) Jimmerson complains that his trial counsel performed deficiently by failing to object when the trial court refused to allow him to ask Jeffries two questions on re-cross-examination. "A trial court has broad discretion in determining the scope of relevant cross-examination. [Cit.]" *Sims v. State*, 280 Ga. 606, 608 (4) (631 SE2d 656) (2006). At the motion for new trial hearing, Jimmerson failed to establish what questions his trial counsel intended to ask on re-cross. As such, Jimmerson cannot establish that the trial court abused its broad discretion such that his trial counsel could have asserted a meritorious objection to the limitations the trial court imposed on cross-examination. Further, Jimmerson did not offer evidence regarding the additional testimony trial counsel would have elicited from Jeffries and, accordingly, cannot establish prejudice. See *Bell v. State*, 287 Ga. 670 (3) (697 SE2d 793) (2010).

(g) Finally, Jimmerson argues that his trial counsel was ineffective because he remained silent during sentencing when the prosecutor erroneously stated that Jimmerson did not have a right to file a petition for a writ of habeas corpus. In fact, the record reflects that Jimmerson's trial counsel responded that Jimmerson had a right to file a habeas petition. Even if his trial counsel had stood silent, Jimmerson cannot establish prejudice. After announcing its sen-

tence, the trial court advised Jimmerson that he had the right to challenge his convictions in habeas proceedings. Additionally, at the State's request, the trial court advised Jimmerson at the motion for new trial hearing that regardless of "whatever was told to [him] before," he had a right to seek relief in habeas proceedings.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 13, 2011.

*Patrick G. Longhi,* for appellant.

*Paul L. Howard, Jr., District Attorney, Paige R. Whitaker, Elizabeth A. Baker, Assistant District Attorneys, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Christopher R. Johnson, Assistant Attorney General,* for appellee.