NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 11, 2023

S23A0728.  PRIESTER v. THE STATE.

WARREN, Justice.

In March 2020, Darnell Priester was convicted of malice murder, aggravated battery, and other crimes in connection with the shooting death of Thomas Robinson and the non-fatal shooting of Timothy Nelson.  He appeals those convictions, arguing that the evidence presented at trial was not sufficient to support them, the trial court erred by denying him a new trial on the general grounds, and the trial court committed plain error by not giving jury instructions related to justification and perjury.  Priester also argues that his trial counsel provided ineffective assistance by failing to object to the lack of jury instructions related to justification and perjury; failing to object to testimony that implicated Priester's right to remain silent; failing to cross-examine Shane Godsey;

requesting an instruction on the necessity of corroboration of accomplice testimony; failing to file a pretrial motion for immunity; and failing to object to narrative testimony, to "asked and answered" testimony, and to the prosecutor "testifying."

As explained below, we conclude that the evidence was sufficient to support Priester's convictions; his thirteenth juror claim presents nothing further for this Court to review; Priester has not shown plain error related to the jury instructions; and Priester has failed to prove that counsel's assistance was ineffective in any of the ways alleged. Thus, we affirm Priester's convictions.[1]

---

[1] The shooting occurred in August 2017. In October 2017, a Paulding County grand jury indicted Priester for malice murder, felony murder, five counts of aggravated assault (against Robinson, Nelson, Shakeemia Bedford, Te'Ara Starks, and Marquis Lewis), aggravated battery against Nelson, and two counts of possession of a firearm during the commission of a felony (for the murder of Robinson and aggravated assault of Nelson). At a trial in February 2020, a jury found Priester guilty of all counts. In March 2020, the court sentenced him to serve life in prison without parole for malice murder, 20 concurrent years in prison for aggravated battery, 20 concurrent years in prison for each of three aggravated assault counts, and 5 consecutive years in prison for one of the firearm possession counts. The remaining counts were merged or vacated by operation of law. Priester timely moved for a new trial, amending it twice with new counsel. In January 2023, after an evidentiary hearing, the trial court denied Priester's amended motion. He filed a timely notice of appeal. The case was docketed to the April 2023 term of this Court and submitted for a decision on the briefs.

1. The evidence presented at trial showed the following.[2] On August 18, 2017, Priester, his brother Josh, and their friend Makaylen Sullivan went to a football game at their high school. Also at the game was a second group of teenagers, which included Robinson, Nelson, Shakeemia Bedford, Te'Ara Starks, and Marquis Lewis. Robinson's group and Priester's group had a history of conflict, including a fight at a gas station in July 2017 between Nelson and Priester.[3] Sullivan testified that at the game, Robinson and his friends were "acting like they want[ed] to fight, bothering us."[4] Nelson testified that Priester "bumped into" him at the game.

---

[2] Because this case requires an assessment of the harmful or prejudicial effect of one alleged trial court error and one alleged deficiency of trial counsel, "we lay out the evidence in detail and not only in the light most favorable to the verdicts." *Clark v. State*, 315 Ga. 423, 424 (883 SE2d 317) (2023) (citation and punctuation omitted).

[3] Additionally, a police officer, who testified that he believed there was "an ongoing dispute between the parties," "remember[ed] an incident where someone had shot at [the Priesters'] home," and an incident in May 2015 when "15 or so people" gathered around the Priesters' house "screaming and cursing at them and threatening [Ms. Priester] and her boys." He believed that this incident was linked to conflict between the Priesters and someone who was friends with Robinson's group.

[4] Before testifying, Sullivan invoked his Fifth Amendment right to remain silent, and the State granted him use immunity for his testimony.

After leaving the football game, Priester's group went to Shane Godsey's house. Later that night, Lewis, from Robinson's group, went to Godsey's house to buy marijuana. Lewis testified that at the house, Priester "came to me and started cursing me out and calling me out . . . and telling me to tell my friends to pull up," meaning "to come to them." Sullivan, on the other hand, testified that when Lewis saw one or both of the Priester brothers at the house, Lewis started cursing and said, "Oh, that's your b**ch a**"; Lewis left after about five minutes, but said, "we finna pull back up."

Lewis and the rest of Robinson's group then decided to drive to Godsey's house in Starks's car. At some point, either before they began driving or on the drive there, Bedford told the group that the Priester brothers owed her $20, and she said, "I want his head." Bedford testified that the group was not "attempting to go get the $20, but their intentions were to fight," and Nelson told a police officer after the shooting that the group went to fight the Priester brothers. At trial, however, Nelson testified that they were going to the house "to retrieve [Bedford]'s money," and Lewis testified that

4

the "whole car" agreed that they were going to retrieve Bedford's $20 or two grams of marijuana. There was no evidence presented that anyone in this group had a gun.

The group arrived at Godsey's house around 11:30 p.m., and Bedford yelled at people inside the house about her $20. Robinson, Nelson, and Lewis got out of the car.[5] Lewis walked around the house, and Nelson went to the front door. Nelson testified that he "calmly" "knocked on the door three times" using a "normal knock," and Lewis testified that Nelson used a "simple knock" and was "very calm." Sullivan, on the other hand, testified that when the group arrived, "they got out the car and started beating on the door, like bring your b**ch a** outside," and they continued to "beat on the door" for five to ten minutes. Godsey similarly testified that Nelson knocked "very loudly" on the door, was "in a bit of a rage" and "very hostile," and told the Priester brothers to "get the 'F' out here now."

Godsey testified that he answered the door and told Nelson to

---

[5] Sullivan, who was in the house, testified that the group that drove up was "3 cars deep full of people." However, Nelson, Bedford, Starks, and Lewis testified that they all arrived in one car.

leave or he would "call the authority." Godsey then went back in the house and closed and locked the door. Nelson testified that he walked away from the house and stood in the street for two or three minutes, waiting for someone to come out of the house. Starks testified that Robinson, Nelson, and Lewis were "walking back to [her] car" and "arguing with Josh and [Priester]." Then, someone fired a gun three to five times from one of the upstairs windows in the house. Robinson was hit once in the chest, Nelson was hit once in the leg, and the car that Bedford and Starks were in was hit twice, with one bullet going through the bumper and one bullet grazing the trunk.[6] Robinson died from his injury, and Nelson testified that he had a scar and permanent nerve damage in his leg and that the injury "kind of affects the way I walk at times."

Nelson testified that when the shooter in the window was illuminated by the flash of the gun, he "saw a white shirt." Lewis

---

[6] Witnesses testified that they heard three or four shots. Priester said in his police interview that he heard five shots. Two bullets were recovered: one from Robinson's body and one in the street.

similarly testified that when he saw someone "raise the window," he saw a "white shirt" that looked like the white shirt he had seen Priester wearing at the football game.[7]  Surveillance video from the entrance to the football game showed someone—who was identified as Priester by Nelson at trial—entering and leaving the football game earlier that evening wearing a white shirt.[8]  Godsey testified that Priester was wearing a white shirt and Josh was wearing a black shirt that night.

Six days after the shooting, Sullivan wrote in a statement to police that after Robinson and Nelson "tried to lure" the Priester brothers outside Godsey's house, Priester "opened a window and shot at the crowd."[9]  Godsey testified that after the shots were fired,

---

[7] On cross-examination at trial, Lewis acknowledged that he had not mentioned the white shirt in his statement to police.

[8] Priester was walking with two other people, who were wearing black shirts.

[9] At trial, Sullivan testified that he heard the gunshots but did not know where they came from.  He further testified that he did not remember writing that he saw Priester shoot out of the window, that his statement was "fabricated," and the officer taking his statement was "basically giving [him] information to write down."

he looked for "a slight second" in the room the shots came from, and "thought" he saw the Priester brothers on the floor "covering their heads." However, the Priester brothers were not in the room when he returned to it soon after, and he then found them in the basement, lying on the ground "with their hands over their heads, scared, saying they were going to die. They're trying to kill us."

On the night of the shooting, Priester was interviewed by Chief Bill Gorman, the lead detective on the case, and another officer from the Dallas Police Department. A video recording of the interview was played for the jury. Priester, who was wearing a white shirt, admitted that he was at Godsey's house at the time of the shooting, but said that he "wasn't in the room when it was happening," that he ducked down when the shots were fired, and that "Brandon Glenn," who was wearing a red shirt, was the shooter. Priester said that he did not know Glenn, but Glenn had approached his group at the football game and gone back to Godsey's house with them. Priester "d[id]n't know" why Glenn shot at Robinson's group. Priester said that Glenn was 17 years old and attended Hiram High

School. A Dallas police officer testified that no one with that name could be found as ever having attended that school or any other school in the county.

Priester did not testify at trial. His defense was that he was not the shooter and he did not identify the real shooter because he was protecting that person. Priester also emphasized in closing argument the ongoing dispute between the two groups and the evidence showing that Robinson's group came to Godsey's house to fight. Priester was convicted of malice murder, aggravated battery, three counts of aggravated assault, and possession of a firearm during the commission of a felony.

2. Priester challenges the sufficiency of the evidence supporting his convictions in several ways.

(a) He argues that the evidence presented at trial was not sufficient to support his convictions as a matter of constitutional due process. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). "In evaluating the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence

presented at trial in the light most favorable to the verdict and ask whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crime of which he was convicted." *Perez v. State*, 316 Ga. 433, 437 (888 SE2d 526) (2023). See also *Jackson*, 443 U.S. at 319.

As discussed above, the evidence presented at trial included undisputed evidence that Priester was at Godsey's house. Sullivan told police that he saw Priester open the window and shoot into the crowd. Two other witnesses testified that the person in the window from where the shots came was wearing a white shirt, and video from the football game and testimony showed that Priester was wearing a white shirt that night. People from Robinson's group testified that they were outside walking away from the house when shots were fired, and there was no evidence that any of them had a weapon. Thus, the evidence presented at trial, when viewed in the light most favorable to the convictions, was sufficient to support Priester's convictions. See *Bullard v. State*, 307 Ga. 482, 483 (837 SE2d 348) (2019) (holding that the evidence was sufficient to

10

support Bullard's convictions for murder and other crimes where two witnesses told police that they saw Bullard shoot at the victim, although they recanted at trial); *Jackson v. State*, 315 Ga. 543, 551 (883 SE2d 815) (2023) (holding that the evidence was sufficient for the jury to reject Jackson's claim of self-defense when the victim was "not within close range" of Jackson and was "walking back toward his car").

(b) Priester further argues that the trial court erred by denying his motion for a directed verdict as to the charge of aggravated battery against Nelson. In considering this claim, we apply the same standard used to determine if the evidence is constitutionally sufficient. See *Lumpkin v. State*, 310 Ga. 139, 144 n.4 (849 SE2d 175) (2020). "A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof." OCGA § 16-5-24 (a).

Priester argues that the evidence supporting the aggravated

11

battery conviction was not sufficient because there was no "medical testimony" about Nelson's wound and Chief Gorman testified that Nelson suffered a "minor gunshot injury."[10]  However, Nelson testified that his leg was scarred, he suffered permanent nerve damage, and the injury "kind of affects the way [he] walk[s] at times."  This alone was sufficient evidence to support Priester's conviction for aggravated battery.  See *Jimmerson v. State*, 289 Ga. 364, 366 (711 SE2d 660) (2011) ("The evidence regarding Colbert's rehabilitation and his ongoing gait impairment was sufficient to allow the jury to conclude that Colbert's legs were rendered useless.").  See also OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact.").  And the resolution of any discrepancies between Nelson's testimony and Chief Gorman's testimony was up to the jury.  See *Perez v. State*, 316 Ga. 433, 437 (888 SE2d 526) (2023) ("We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility

---

[10] Chief Gorman testified that on the night of the shooting, he went to the hospital to speak to Nelson and observed that Nelson "had a minor gunshot injury to the back of his left calf up near the knee."

12

of witnesses, and reasonable inferences to be derived from the facts.") (citation and punctuation omitted).

(c) Priester contends that the evidence did not support his convictions under OCGA § 24-14-6, which says: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." "However, this doctrine applies only where the State's case against the defendant was wholly circumstantial." *Jackson v. State*, 310 Ga. 224, 228 (850 SE2d 131) (2020) (citation and punctuation omitted).

Here, the State did not rely solely on circumstantial evidence. The State presented direct evidence of Priester's guilt in the form of Sullivan's written statement that Priester "shot at the crowd." See *Willis v. State*, 315 Ga. 19, 24 (880 SE2d 158) (2022) (explaining that eyewitness testimony identifying the shooter is direct evidence of guilt). This is true even though Sullivan recanted his statement at trial. See *Jackson*, 310 Ga. at 228 ("[D]irect evidence is not converted into circumstantial evidence by a witness' lack of

13

credibility."). Thus, Priester's statutory challenge to the sufficiency of the evidence fails.

3. Priester next argues that the trial court should have granted him a new trial because the verdicts were "contrary to the law and evidence" and "to the principles of justice, fairness, and equity." This argument implicates the "general grounds" for obtaining a new trial under OCGA §§ 5-5-20 & 5-5-21.[11]

> When these so-called "general grounds" are properly raised in a timely motion for new trial, the trial judge must exercise a broad discretion to sit as a 'thirteenth juror. . . . [T]he merits of the trial court's decision on the general grounds are not subject to our review, and the decision to grant a new trial on the general grounds is vested solely in the trial court.

*King v. State*, 316 Ga. 611, 616 (889 SE2d 851) (2023) (citations and punctuation omitted).

To the extent Priester argues the trial court failed to exercise

---

[11] OCGA § 5-5-20 says: "In any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury." OCGA § 5-5-21 says: "The presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."

14

its discretion as the thirteenth juror, we disagree. In its order denying Priester's motion for new trial, the court set forth the general grounds standards and expressly stated that it "has considered but declines to grant a new trial under the forgoing general grounds."[12] Thus, this claim fails. See *King*, 316 Ga. at 616.

To the extent this claim can be construed as a challenge to the sufficiency of the evidence supporting Priester's convictions, this claim fails for the reasons discussed in Division 2 above.[13]

4. Priester complains that the trial court did not give the jury instructions he requested related to justification and perjury.

---

[12] As part of this enumeration of error, Priester asserts that the trial court should have considered a number of points in ruling on this claim, including allegedly false testimony and allegedly improper closing argument. The trial court expressly considered these points in rejecting Priester's thirteenth juror claim.

[13] We note that although we have often reviewed the sufficiency of the evidence as a matter of constitutional due process when an appellant raises a general grounds claim on appeal, many of us have begun to question that approach. See *King*, 316 Ga. at 616 n.8 ("[M]any of us question whether it is proper for this Court to import *Jackson* into an appellate review of the general grounds (or to otherwise rely on *Jackson* as part of that analysis).") However, like in *King*, we need not determine the propriety of that practice today, because the evidence against Priester was constitutionally sufficient to affirm his convictions.

15

Because Priester failed to raise these objections after the jury was charged, we review Priester's claims only for plain error. See OCGA § 17-8-58. See also *Reese v. State*, ___ Ga. ___, 2023 WL 5338589, at *5 (Aug. 21, 2023).

To succeed on his claims, Priester must prove that all four prongs of the plain error test are met.

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error— discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

Id. (citations and punctuation omitted). "To authorize a requested jury instruction, there need only be slight evidence to support the theory of the charge." *Collins v. State*, 308 Ga. 515, 519 (842 SE2d 275) (2020) (citation and punctuation omitted).

16

(a)    Priester first argues that the trial court should have instructed the jury on justification, self-defense, "stand your ground," and defense of habitation.    See OCGA § 16-3-21 (a) ("A person is justified in . . . using force against another when . . . necessary to defend himself or herself or a third person")[14]; OCGA § 16-3-23.1 (providing that a person who used force "in defense of self or others" or "in defense of a habitation . . . has no duty to retreat and has the right to stand his or her ground")[15]; OCGA § 16-3-23 ("A

---

[14] OCGA § 16-3-21 (a) says in full:
A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

[15] OCGA § 16-3-23.1 says in full:
A person who uses threats or force in accordance with Code Section 16-3-21, relating to the use of force in defense of self or others, Code Section 16-3-23, relating to the use of force in defense of a habitation, or Code Section 16-3-24, relating to the use of force in defense of property other than a habitation, has no duty to retreat and has the right to stand his or her ground and use force as provided in said Code sections, including deadly force.

17

person is justified in . . . using force against another when . . . necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation").[16]  Priester argues that, whoever the shooter was, there was evidence that the shooter's actions were justified because Robinson's group came to the house to fight and created a "threatening environment" to make it clear that Priester and his friends were not safe in their own home.

---

[16] OCGA § 16-3-23 says in full:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;

(2) That force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred; or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

18

Even assuming for purposes of argument that there was slight evidence of justification and the trial court committed a clear and obvious error by declining to give the requested justification-related instructions, Priester has failed to show that the lack of these instructions affected the outcome of his trial. Even crediting accounts from Sullivan and Godsey that Robinson's group was highly aggressive when it arrived, there was no evidence that anyone in the group had a weapon or was attacking the house when the shots were fired. On the contrary, the evidence indicated that the victims were standing in the street when shots were fired at them. Moreover, in his interview with police after the shooting, Priester identified Glenn (whose identity could not be corroborated and who could not be found) as the shooter but never said Glenn was acting in defense of himself, others, or the house. In light of this evidence, the jury was unlikely to believe that shooting at the crowd outside was "necessary to prevent death or great bodily injury," OCGA § 16-3-21, or "to prevent or terminate . . . unlawful entry into or attack" on the house, OCGA § 16-3-23. Thus, Priester has failed

19

to show that any error in the trial court's failure to give the requested instructions affected his substantial rights. See *Reese*, 2023 WL 5338589, at *6 ("Because the evidence supporting Reese's self-defense theory was weak, we cannot say that the trial court omitting jury instructions on justification likely affected the trial's outcome.").

(b) Priester also argues that the trial court erred when it declined to instruct the jury on perjury, because Nelson, Starks, Sullivan, Bedford, and Lewis provided certain testimony at trial that was inconsistent with statements those witnesses gave to law enforcement before trial. Notably, however, Priester does not specify which of the statements—the unsworn ones the witnesses named above gave to law enforcement before trial or the testimony offered at trial under oath—he believes were false.

(i) At trial, Priester requested that the court instruct the jury:

> [Y]ou can not base a conviction upon perjured testimony. A witness gives perjured testimony when his or her testimony at trial materially contradicts the statement

20

that he or she made to a police officer. Whether a witness has given perjured testimony is [a] matter for you to decide.

Priester has failed to show that the trial court committed a clear or obvious error by declining to give the requested instruction.

"A requested 'jury instruction must be adjusted to the evidence and embody a correct, applicable, and complete statement of law.'" *Tepanca v. State*, 297 Ga. 47, 49 (771 SE2d 879) (2015) (citation omitted). At the time of Priester's trial, OCGA § 16-10-70 (a) defined perjury in this way: "A person to whom a lawful oath or affirmation has been administered commits the offense of perjury when, in a judicial proceeding, he knowingly and willfully makes a false statement material to the issue or point in question."[17] Priester's requested instruction on perjury—which did not match this definition—was not a correct statement of law. Thus, the trial court did not err, let alone clearly or obviously err, by declining to instruct the jury with an incorrect statement of law. See *Alexis v. State*, 273

---

[17] The statute was amended in 2023 to address unsworn declarations made under the penalty of perjury. See Ga. L. 2023, Act 59, § 2.

Ga. 423, 426 (541 SE2d 636) (2001) (holding that the trial court was not required to give the requested charge because it "was not a correct statement of law").

(ii) To the extent Priester is now arguing that the trial court committed plain error by failing to give the pattern jury instruction on perjury, which he cites in his brief, he has again failed to show error, let alone clear or obvious error. Priester argues that a charge on perjury was warranted to address the discrepancies between trial testimony and statements given to law enforcement by Nelson, Starks, Sullivan, Bedford, and Lewis. However, as noted above, Priester does not specify whether his contention is that the unsworn statements to police were false or that the sworn trial testimony was false. And he has pointed to no cases, nor have we found any, holding that a perjury instruction should be given under these circumstances. Moreover, the trial court instructed the jurors that it was their duty to "determine the credibility of the witnesses," and explained:

Your assessment of a trial witness's credibility may be

22

affected by comparing or contrasting that testimony to statements or testimony of that same witness before the trial started. It is for you to decide whether there is a reasonable explanation for any inconsistency in a witness's pretrial statements and testimony when compared to the same witness's trial testimony. As with all issues of witness credibility, you the jury must apply your common sense and reason to decide what testimony you believe or do not believe.

Thus, to the extent that Priester is arguing that an instruction on perjury is required to highlight inconsistencies between the pre-trial statements and trial testimony, the instructions as given covered that concept. See *Wilson v. State*, 315 Ga. 728, 737 (883 SE2d 802) (2023) ("We see no error [in the court's failure to give the requested instruction] because the points of law in Wilson's requested instruction were covered in the court's other instructions.").

5. Priester argues that his trial counsel provided ineffective assistance in multiple ways. To prevail on these claims, Priester must show that his lawyer's performance was constitutionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). See also *Clark v. State*, 315 Ga. 423, 442 (883 SE2d 317)

(2023).  To prove deficient performance, Priester must demonstrate that his counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms."  *Clark*, 315 Ga. at 442 (citation and punctuation omitted).  To establish prejudice, Priester must show a reasonable probability that, "but for counsel's deficient performance, the result of the trial would have been different."  Id.  We need not address both components of this test if Priester makes an insufficient showing on one. See id.  See also *Strickland*, 466 U.S. at 697.

(a)  Priester argues that his trial counsel provided ineffective assistance by failing to object after the trial court refused to give the justification-related instructions discussed in Division 4 (a) above. Even assuming that counsel was deficient in this respect, for the reasons discussed in Division 4 (a), Priester has failed to show that there is a reasonable probability he would have achieved a different result at trial if counsel had objected.  See *Clark*, 315 Ga. at 442 ("[T]he test for prejudice in the ineffective assistance analysis is

24

equivalent to the test for harm in plain error review.") (citation and punctuation omitted). See also *Hood v. State*, 303 Ga. 420, 427 (811 SE2d 392) (2018) ("We need not decide whether trial counsel's failure to preserve Appellant's claims of instructional error amounted to deficient performance, because . . . Appellant has not shown a reasonable probability that his trial would have ended more favorably for him had his counsel preserved his claims of instructional error.").

Priester also argues that counsel provided ineffective assistance by failing to object to the court's failure to instruct the jury on perjury. This claim fails for the reasons discussed in Division 4 (b). Because the trial court did not err by declining to give the requested instruction, counsel was not deficient in failing to object to the lack of that instruction. See *King*, 316 Ga. at 625 ("[F]ailing to make a meritless objection is not constitutionally deficient.").

(b) Priester argues that counsel provided ineffective assistance by failing to object to Chief Gorman's testimony that—according to

Priester—violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution by commenting on Prieter's "post-*Miranda* silence." At trial, before Priester's interview was played for the jury, Chief Gorman explained that Priester was read his rights under *Miranda*,[18] agreed to answer questions without an attorney, and never invoked his right to remain silent. Then the following exchange occurred:

> PROSECUTOR: Did the Defendant ever refuse to answer any further questions throughout the course of the interview?
> GORMAN: No. He was very cooperative.
> PROSECUTOR: Is the time that you are referring to the only time the Defendant was interviewed by you or in your presence?
> GORMAN: Yes. After the interview I never spoke to him again.

At the motion-for-new-trial hearing, trial counsel explained that he did not object to this testimony because counsel did not see this statement as implicating Priester's right to remain silent, although he noted, "[i]n hindsight, I can see the implication."

---

[18] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

However, when viewed in context, Chief Gorman's testimony was not an improper comment on Priester's silence. He clearly testified that Priester never invoked his right to remain silent, and the complained-of statement was merely an explanation that the custodial interview was the only time he talked to Priester. Thus, Priester's counsel was not deficient for failing to object to the testimony. See *Clark v. State*, 299 Ga. 552, 554-555 (787 SE2d 212) (2016) ("[T]he prosecutor's comments, when viewed in their full context, were not comments on Clark's pre-arrest silence. . . . [H]is trial counsel did not render ineffective assistance by failing to make this meritless objection to the comments.").

(c) Priester argues that his counsel provided ineffective assistance by failing to cross-examine Godsey and not asking Godsey if it was possible that the members of the group outside the house were going back to their car for guns. At trial, counsel did not ask Godsey any questions on cross-examination, and at the motion-for-new-trial hearing, counsel testified that he did not cross-examine Godsey because the defense team had spoken with Godsey before

27

trial and "there was some reason based upon our interview with him and his testimony that we decided that it would be best not to cross-examine him." Godsey did not testify at the motion-for-new-trial hearing.

"The scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." *Bonner v. State*, 314 Ga. 472, 476 (877 SE2d 588) (2022) (citation and punctuation omitted). Priester has not shown that his counsel's decision—based on counsel's conversation with Godsey and Godsey's testimony—was deficient, particularly in light of Priester's failure to demonstrate that Godsey would have given a response helpful to Priester if he had been asked if it was possible that Robinson's group was going to retrieve guns from the car. See *Bonner*, 314 Ga. at 476 (holding that Bonner failed to show that counsel's performance was deficient in failing to cross-examine several witnesses, where counsel explained at the motion-for-new-trial hearing that he would usually cross-examine witnesses if he "ha[d] something to cross[-]examine" them about and Bonner did not "demonstrate how cross-

28

examination of these witnesses would have been helpful to him").

(d) Priester argues that counsel provided ineffective assistance by requesting an instruction on accomplice corroboration. At trial, Priester's counsel requested an accomplice corroboration instruction, arguing that Sullivan, who was in the house with Priester, "c[ould] be an accomplice, because he could be the shooter." The trial court agreed to give the requested instruction. In closing argument, trial counsel reminded the jury that the State gave Sullivan, whom counsel described as "the only eyewitness," use immunity for his testimony. Counsel argued: "one of the other things that the Judge is going to tell you about Mr. Sullivan is about an accomplice" and explained that an accomplice's testimony "must be supported by . . . some other evidence." Later in his argument, counsel said, "Remember Makaylen Sullivan is an accomplice and you can't take the word of an accomplice on its own without some other supporting evidence."

"Decisions on requests to charge involve trial tactics to which we must afford substantial latitude, and they provide no grounds for

reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them." *Moulder v. State*, ___ Ga. ___, 2023 WL 5338774, at *9 (Aug. 21, 2023). It was not patently unreasonable for Priester's counsel to request an instruction explaining the need for corroboration of accomplice testimony in support of the argument that the jury should not credit Sullivan's account of the shooting, which included identifying Priester as the shooter. See id. (holding that counsel's performance was not deficient where he reasonably requested a specific jury instruction in support of an argument he made in closing attempting to undermine the thoroughness of the State's investigation). Thus, Priester has failed to show that his counsel's performance was deficient.

(e) Priester argues that counsel provided ineffective assistance by failing to file a motion for immunity from prosecution under OCGA § 16-3-24.2.[19] At the motion-for-new-trial hearing, counsel

---

[19] OCGA § 16-3-24.2 says: "A person who uses threats or force in accordance with Code Section 16-3-21, 16-3-23, 16-3-23.1, or 16-3-24 shall be

testified that he did not file a pre-trial motion for immunity because the defense team did not feel "comfort" in Priester testifying. Priester has not shown that this was unreasonable trial strategy, particularly in light of the weakness of his self-defense argument discussed in Division 4 above. See *Tabor v. State*, 315 Ga. 240, 249 (882 SE2d 329) (2022) ("It may be reasonable for trial counsel to forgo a pre-trial immunity motion so as to avoid subjecting his client to pre-trial cross-examination, or for counsel to elect to demonstrate self-defense to the jury, rather than to the judge.") (citation and punctuation omitted).

(f) Finally, Priester argues that trial counsel provided ineffective assistance by failing to object to narrative testimony, to "asked and answered" testimony, and to the prosecutor "testifying" by repeating testimony given by a witness or asking leading questions. At the motion-for-new-trial hearing, trial counsel testified that deciding whether to raise these kinds of objections was

immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title."

31

an "on the spot" or "instinctive" decision that he made, considering factors such as whether the testimony was prejudicial and whether objecting would be "disruptive" or "rub the jury the wrong way."

In raising this claim, Priester does not specifically discuss any of the allegedly improper questions or answers. Instead, he has included a string cite of transcript pages and argues generally that every instance of narrative testimony, "asked and answered" testimony, and the prosecutor "testifying" was prejudicial to him. These string cites—which fail to highlight any question or answer that was particularly prejudicial to Priester—do not suffice to show that counsel made a patently unreasonable decision by choosing not to object to each instance of allegedly objectionable questions or answers and choosing instead to consider factors such as the potential prejudice from the testimony or potential disruption from the objection. Thus, Priester has failed to demonstrate that counsel's performance was deficient. See *Moulder*, S23A0508, 2023 WL 5338774, at *6 ("[R]easonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide

32

no ground for reversal.") (citation and punctuation omitted).[20]

*Judgment affirmed. All the Justices concur.*

---

[20] Citing *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020), Priester argues that all of the claims he has raised resulted in cumulative prejudice affecting the outcome of his trial. Even assuming that this cumulative error analysis applies to a trial court's failure to give specific jury instructions, Priester's claim fails. See *Park v. State*, 314 Ga. 733, 745 (879 SE2d 400) (2022) (assuming without deciding that two instances of counsel's deficient performance should be considered cumulatively with an assumed trial court error for failing to give a jury instruction). We have assumed only one trial court error—the failure to give justification-related instructions—and only one deficiency by trial counsel—the failure to object to the lack of these instructions. Because the harm from this assumed error and assumed deficiency is the same—the jury was not given the requested instruction—and we have concluded that the lack of these instructions did not likely affect the outcome of the trial, Priester's cumulative error claim fails. See *Harris v. State*, 313 Ga. 872, 885 n.11 (874 SE2d 73) (2022) ("Of the claims of trial court error at trial that he raises, we conclude that only one of those has any possible merit, and any error was harmless. That possible error involves the same evidence—text messages—as to which we pretermitted the issue of deficient performance in our prior opinion in this case. Thus, there is nothing to consider cumulatively with the harm from the text messages, and this claim fails.").