NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 9, 2025

S25A1246.  FRISON v. THE STATE.

PINSON, Justice.

Xaiver Frison shot and killed Arlontae Marks during an argument between Marks and Frison's sister about Marks' dog.[1] At trial, Frison claimed self-defense, relying mostly on testimony from Frison and his sister that Marks had a gun, but surveillance footage showed

---

[1] Marks was killed on November 10, 2022. In February 2023, a Fulton County grand jury returned an indictment that charged Frison with malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. After a jury trial from August 28 to 31, 2023, Frison was found guilty of all counts. The trial court sentenced him to life in prison for malice murder and a consecutive term of five years in prison for possession of a firearm during the commission of a felony; the felony murder count was vacated by operation of law and the aggravated assault count merged with the malice murder count. Frison, through trial counsel, timely filed a motion for new trial. He later changed counsel, and new counsel filed a brief in support of the motion for new trial. After a hearing, the trial court denied the motion for new trial on May 8, 2025, and Frison timely filed a notice of appeal. His appeal was docketed to the August 2025 term of court and submitted for a decision on the briefs.

otherwise. The jury convicted Frison of malice murder and possession of a firearm during the commission of a felony. On appeal, he claims that his convictions should be reversed because the State failed to disprove his claim of self-defense. For the reasons that follow, that claim fails and his convictions are affirmed.

1. According to the evidence at trial, Frison's sister, Calje Jordan, had known Marks and his family since she was a teenager, and she also knew Marks' girlfriend, Kelsey Bearden. In July 2021, Jordan began subletting her apartment to Bearden and Marks. In September 2022, Bearden and Marks stopped paying rent.

Some time later, Jordan tried to evict Marks and Bearden, and in November of 2022, Bearden and Marks began moving out. But as of November 9, 2022, many of their belongings — and their dog, Dilly — remained. When Bearden and Marks returned to Jordan's apartment on the night of November 9, the locks had been changed, and they had to get a locksmith to let them inside. Once inside, Marks and Bearden found that Dilly and some of their belongings were missing from the apartment.

As Bearden and Marks were leaving to go to their new home, they ran into Jordan in the lobby. Bearden asked Jordan about Dilly, but Jordan ignored her and kept walking to the elevator. Jordan then returned to the lobby and gave Bearden paperwork that Jordan said was a temporary protective order.[2] Bearden and Marks left and spent the night at their new home. They returned the next afternoon.

The next day, Frison was visiting Jordan at her apartment. According to Jordan, Marks tried to kick in the door to the apartment. While kicking the door, Marks said he was "going to put [Jordan] with [her] brother that passed away and [her] fiancé that passed away." According to Frison, Marks "was cussing like, b***h where my dog at."[3] This went on for "[a] little more than a minute," and Marks did not get inside the apartment. Jordan called the police.

From the apartment, Jordan saw that Marks and Bearden had

---

[2] Bearden testified that police officers later told her that the temporary protective order had not been served and that no eviction had been filed.

[3] Frison testified that two days earlier, when he and Jordan were at the apartment, Marks "started banging on the door." They did not let Marks in, and Jordan called the police. This was the first time Frison saw Marks.

blocked her car with Marks' car. Jordan and Frison went outside to Jordan's car, and, according to Jordan, Marks and Bearden started "running towards" her.

Jordan testified that Marks "pulled out his gun from his pouch," she told him to "put his gun up," and then Marks began arguing with Frison. Frison also testified that Marks "pulled a gun out of his pouch, his purse, whatever that is" and Marks "seemed mad." Jordan testified that Marks "had his gun in his hand. He put it away, then he took it back out. So he pulled his gun out three times." According to Jordan, Marks then started "[c]hasing" Jordan and Frison as they walked to the lobby of the apartment building. Frison testified that he and Jordan started "[b]acking away to the lobby" while Marks still had his gun out. Jordan testified that Bearden was yelling that she was "going to beat [Jordan's] ass." Frison testified that he could not remember Marks' exact words, just that he was making threats and asking about his dog. Both Frison and Jordan denied knowing what happened to Dilly, although Frison testified

4

that he had seen the dog at the apartment two days earlier.[4]

Frison testified that, as he moved to the lobby, Marks was "getting aggressive" and seemed "really mad." Inside the lobby, Frison "kept backing back," but then "turned to try to walk away." When he turned, he saw "out the corner of [his] eye" that Jordan had "pulled out the gun," so he "hurried up and grabbed the gun and blacked out." Frison testified that he remembered shooting Marks because Frison "was scared." But Frison said he did not remember how many times he shot Marks or that he shot him in the back, only that he "shot in fear." Frison said he "closed [his] eyes" and "wasn't looking" when he shot at Marks, but he fired because he thought Marks was going to shoot him and Jordan. Frison identified State's Exhibit 47 as the gun he used to shoot Marks. He testified that he "normally bring[s] a gun" with him.

Jordan testified that, after she and Frison ran back inside with Marks and Bearden following, she took a gun out of her bag because

---

[4] Jordan denied removing the dog from the apartment. Bearden testified that she never learned what happened to Dilly.

Marks was "chasing [her] with a gun" but she did not know what happened with the gun she took out of her bag. Jordan then testified that Frison "rubbed against" her, and she thought he was the one who fired the shots that she heard, but that she "blacked out" and did not see who took the gun and fired the shots.

Bearden testified that she returned to the car as Marks, Frison, and Jordan moved toward the apartment building because the argument "wasn't heated anymore." Bearden then heard gunshots, and when she turned toward the building, she saw Marks "face forward on the ground."

After the shooting, Jordan and Frison ran because Jordan was "scared" and Frison "thought one of them was going to shoot [him] still." Jordan and Frison were both detained and interviewed soon after the shooting.

Someone called 911, and when officers arrived, Marks was unresponsive. He had a handgun holstered in his waistband, which an officer removed and secured.

Contrary to the testimony of Jordan and Frison, surveillance

6

footage of the incident, which was admitted into evidence and played at trial, showed that Marks did not have anything in his hands and did not gesture to the gun concealed at his waist at any point as he walked to the apartment building behind Jordan and Frison.[5] According to Bearden, Marks "always" carried his gun, but it was concealed under his shirt that day and she never saw him pull out the gun and never heard him threaten to do so. Two people who worked at the apartment complex testified that they saw the altercation and heard Marks, Frison, and Jordan "yelling" that day, but neither of the workers saw any weapons until one of them saw Jordan take a gun out of her bag.

The medical examiner determined that Marks died from multiple gunshot wounds. In total, Marks suffered eight gunshot wounds, including two to the back and two to the buttocks. The medical examiner also observed "abrasions on the waist and upper thigh that are consistent with shrapnel or blunt force trauma by hitting

---

[5] On appeal, Frison concedes that Marks did not have a gun out during the altercation.

something hard," which could include falling on a gun.

Eight .40-caliber cartridge cases were collected from the crime scene, and an expert in firearm comparison testified that all eight were fired by the Glock pistol that Frison admitted he used to shoot Marks. None of the cartridge cases matched the gun found holstered at Marks' waist, and that gun's magazine was full.

2. Frison claims on appeal that the State failed to disprove his self-defense theory beyond a reasonable doubt. We address that claim as a sufficiency claim and review it under the standard set forth in *Jackson v. Virginia*, 443 US 307 (1979). See, e.g., *Mills v. State*, 320 Ga. 457, 461 (2024). Under that standard, we assess whether, when viewed in the light most favorable to the verdict, "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting *Jackson*, 443 US at 319). In making that assessment, we neither weigh the evidence on appeal nor resolve conflicts in trial testimony. Instead, we "defer to the jury's assessment of the weight and credibility of the evidence." *Chambliss v. State*, 318 Ga. 161, 163 (2023) (cleaned up). It

is the jury's role to evaluate the evidence, and in doing so, the jury is free to reject evidence that supports the defendant's claim of self-defense and credit evidence that he did not act in self-defense. See *Allen v. State*, 322 Ga. 417, 422–23 (2025).

For a malice murder conviction, the State must prove that the defendant acted with "malice, which incorporates the intent to kill." *Scoggins v. State*, 317 Ga. 832, 836 (2023); OCGA § 16-5-1(a). As for self-defense, to justify the use of deadly force, a defendant must show that he "reasonably believe[d] that such force [was] necessary to prevent death or great bodily injury to himself" or to others. OCGA § 16-3-21(a). A homicide is not so justified "if the force used by the defendant exceeds that which a reasonable person would believe was necessary to defend against the victim's unlawful act." *Nelson v. State*, 283 Ga. 119, 120 (2008). When a defendant raises a justification defense at trial, the State has the burden of disproving that defense beyond a reasonable doubt. *Reese v. State*, 317 Ga. 189, 196 (2023).

Viewed in the light most favorable to the verdict, the evidence

here authorized the jury to find that Frison intended to kill Marks and to reject his claim of self-defense. Although Frison concedes on appeal that Marks did not have a gun in his hand during the argument, both Frison and Jordan testified at trial that Marks had a gun, notwithstanding the video evidence that showed he did not. Given this clear contradiction between Jordan and Frison's testimony and the video evidence, the jury was authorized to disbelieve this testimony in full and instead to view Frison's testimony as substantive evidence of guilt. See *Mims v. State*, 310 Ga. 853, 855 (2021) (defendant's testimony "may itself be considered substantive evidence of guilt when disbelieved by the jury, so long as some corroborative evidence exists for the charged offense"). And ample evidence authorized the jury to conclude that Frison could not have reasonably believed that shooting Marks was necessary to defend himself or Jordan. That evidence included Bearden's testimony that the argument "wasn't heated anymore" by the time the group went into the apartment building; testimony and surveillance footage that showed Marks never fired or even reached for the concealed weapon later

found in his waistband; and the evidence that Frison fired his gun eight times and hit Marks eight times, including twice in the back and twice in the buttocks. See *Walker v. State*, 312 Ga. 232, 235–36 (2021) (although it was undisputed that the victim had a gun at the time of his encounter with the defendant, there was no evidence other than the defendant's testimony that the victim ever drew his gun and no evidence that the victim ever fired the gun, so the jury was authorized to reject defendant's claim of self-defense); *Mills*, 320 Ga. at 461 (jury authorized to conclude defendant did not reasonably believe that deadly force was necessary to defend himself and others based on evidence that the victim did not have a gun and was already injured and on the ground when the defendant shot the victim in the back multiple times). Because the evidence was sufficient for the jury to reject Frison's claim of self-defense, his claim on appeal fails.

*Judgment affirmed. All the Justices concur.*